BLAKESLEE ROLLINS CORPORATION, Appellant, Respondent, *v.* THE STATE OF NEW YORK, Respondent, Appellant. (Claim No. 19465.)

Third Department, November 24, 1933.

*Bartlett, Poe & Claggett* [*Edgar Allan Poe* and *Mark W. Norman* of counsel], for the plaintiff.

*John J. Bennett, Jr., Attorney-General* [*James Gibson, Assistant Attorney-General*, of counsel], for the defendant.

BLISS, J. On the 2d day of June, 1926, the claimant entered into a contract with the State of New York for the construction of the two main piers of the Mid-Hudson bridge at Poughkeepsie. This claim arises out of an alleged breach of this contract by the defendant. The total contract price was $1,889,925. The contract called for the sinking of two caissons, one on either side of the Hudson river, known as the east and west caissons. They were to be sunk until they reached a suitable foundation in the bed of the river and upon these caissons, after they were in place, were to be erected the piers for this highway bridge. While the work was in progress on each of these caissons the east caisson tipped toward the east to an angle of about forty-five degrees and was thereafter righted and sunk. The principal item claimed by the claimant against the defendant is for the righting of this caisson.

These caissons were designed by Daniel E. Moran, one of the

leading authorities in the country on bridge and foundation construction. His experience extended for nearly fifty years and consisted of designing and superintending the construction of many different kinds of piers, foundations, caissons, shafts, buildings, pneumatic caissons, canals, dams, power houses, hydraulic developments, docks and other construction works. On caissons alone he had been connected with the designing or construction of over two thousand. On the Mid-Hudson bridge the work was to be done by the open caisson method. These caissons were to be sunk until they reached a level which would afford a suitable foundation for the piers. Each caisson was to be one hundred and thirty-six feet in length, sixty feet in width, rounded at the ends with longitudinal and transverse walls dividing the interior into twenty-five open pockets known as dredging pockets. The lower or base section of the caisson was twenty-one feet in height, its walls constructed of steel plate from three-fourths to seven-eighths of an inch in thickness, the wall filled with concrete about three and one-half feet in thickness, the interior longitudinal walls about three feet and the transverse walls about two and one-half feet thick. The bottom edge of the perimeter wall was beveled upward toward the center so as to form a cutting edge to enable the caisson to cut its way into the river bottom and thus sink to the required depth. The lower sections of the two caissons were constructed some distance from the site. False bottoms braced from the inside were inserted in each pocket and the lower sections were towed to the site and there moored. Additional vertical sections of sixteen feet each were then added from time to time. These sections had an outer form wall of four-inch fir. As these walls were carried up the caissons grew in height and sank deeper into the water. The carrying up of the perimeter walls continued until on June 7, 1927, they were sixty-five feet high and on that date the cutting edge of the east caisson landed on the bottom of the river, which was fifty-six feet deep at this point. Immediately upon landing it listed approximately two feet to the west. It was intended that the bottom of this caisson would finally be located about eighty feet below the river bed. The west caisson was also in due time landed on the river bottom, but it had slipped about eight feet out of position. On July 11, 1927, the walls of the east caisson were seventy-nine feet high, water had been admitted into some of the pockets to give greater weight and the caisson had cut eight feet into the river bottom and listed one foot to the west. On that date a conference was called by Col. Frederick Stuart Greene, State Superintendent of Public Works, to be held in Poughkeepsie on July 15, 1927, for the purpose of having the best possible co-opera-

tion between the engineers and the claimant. This conference was held on July fifteenth. At its conclusion a paper was prepared by the engineers representing the State and handed to the claimant, reading as follows:

" MID-HUDSON BRIDGE — CONFERENCE AT POUGHKEEPSIE
" July 15th, 1927.
" Conclusion; — East Caisson.
" (1) Continue removing bottoms.
" (2) When the bottoms removed on west side correspond to the open pockets on the east side, begin dredging in pockets and continue dredging until it is safe to remove more or all pockets.
" Conclusion; — West Caisson.
" (1) Level up with concrete.
" (2) Lighten caisson by pumping.
" (3) Place stone along west side, 1,000 tons (about).
" (4) Catch on anchor of East Caisson and pull toward east, putting strain on all east anchors.
" (5) Dredge on east side as necessary."

At that time the claimant was engaged in removing bottoms from certain pockets of the east caisson. It had removed those from pockets 3, 5 and 7 on the east side, 20, 22 and 24, which were center pockets, and 16, which was a pocket on the west side. It was also endeavoring to remove the bottoms from two other pockets on the west side, viz., 14 and 12. It will be noted that the contractor was to do two things with relation to the east caisson, one, to continue removing bottoms, two, when the bottoms removed on the west side corresponded to the open pockets on the east side it was to begin dredging in the pockets and continue until it was safe to remove more or all pockets. There is testimony on the part of the defendant that Mr. Moran at this conference advised the contractor that there was to be no dredging beneath the cutting edge. This is contradicted by the claimant's witnesses.

On July 15, 1927, no dredging had been done at the site of the east caisson save a small trench along the northeasterly edge thereof when the cutting edge first landed on the river bottom. After the conference of July 15, 1927, the contractor proceeded to remove bottoms until on the 26th day of July, 1927, he had removed bottoms from three pockets on the east side, five in the center and two on the west side. At that time the bottom of the east caisson had penetrated the river bed approximately eleven feet with a list of four-tenths of a foot to the west. Also, after the conference of July fifteenth the contractor began dredging in the pockets where the bottoms had been removed, and from that date until July 27,

1927, on which day the caisson tipped to the east, two hundred and seventy-seven cubic yards of earth were dredged from the open pockets on the east side of the caisson, four hundred and thirty cubic yards from the center pockets and none from the west pockets, leaving the west one-third of the caisson, an area of approximately twenty by one hundred and thirty-five feet, resting on solid clay and the earth dredged out from underneath the major part of the center and east sections of the bottom. In addition to that, the trench above mentioned, about sixty feet long, had been dredged along the northeast edge of the caisson just before it reached the bottom of the river. No bottoms were taken out on the west side of the caisson until the twenty-sixth of July. *This recital,* however, does not present the *most serious* part of the situation. Holes to certain depths had been dredged beneath the bottom of the caisson through the easterly and center pockets, but more earth had been actually removed from these holes than the depth of the holes indicated, thus establishing that the earth from underneath some of the bottoms which had not been removed or from outside of the cutting edge of the caisson was being forced into the holes thus dredged. This left the bottoms of the pockets which then remained in supported by columns of clay, some of them with water on three sides and indicated a movement of the clay underneath the caisson due to the pressure of *the water* around the outside of the caisson. This reduced the supporting value of the soil by destroying its lateral support. The claimant had in charge of the sinking of this caisson an *inexperienced* man who ordered *excessive* dredging. On the night of July twenty-sixth more material was dredged from underneath the bottom of the caisson than on any other single occasion and at about three-thirty on the morning of July twenty-seventh the caisson tipped to the east and reposed at an angle of approximately forty-five degrees. The Court of Claims found " that the caisson listed because there was a hole dug under one side of it and the caisson fell into the hole." It is apparent that that is exactly what happened. The Court of Claims also found that the unskillful manner with which the claimant carried on the dredging operation was the cause of the caisson tipping. This finding is amply sustained.

It is contended by the claimant that the memorandum of July 15, 1927, constituted an order from the State to the contractor, that such order was carried out and that this was one of the reasons why the caisson listed. It may be conceded that such was the effect of the memorandum because under the contract the State reserved to itself the right to supervise the method of doing the work. The difficulty with the claimant's contention with regard

to this memorandum, however, lies in the fact that it did not comply with the directions therein contained. The Court of Claims has found " that at no time after the conference of July 15th and until after the caisson listed, did the bottoms removed on the west side correspond to the open pockets on the east side." This finding is sustained by the evidence.

In addition to contending that the defendant had issued an order which the claimant was bound to obey and that in so doing the damage had been caused, the claimant contended that the caisson was not properly designed in that it lacked stability and that this was the real reason for the listing of the caisson. The State defends on the ground that the design was proper and claims that the quality of stability was not lacking. In support of its contention, the claimant offered testimony on the part of certain experts to the effect that the center of buoyancy, which is the center of volume of the underwater body, at one stage was lower than the center of gravity and that this caused the caisson to tip. These experts claimed that the caisson was not properly designed to enable it to be lowered to the bottom of the river. Of course, the complete answer to this argument lies in the fact that both caissons were successfully lowered to the river bed. It is true that at one point during the operations, about three feet of sand ballast was added in the bottom of each pocket and that the center walls of the caisson were never constructed as high as the perimeter wall. Be that as it may, each caisson was sunk and the east caisson did not tip until after the claimant had excavated soil from underneath the center and easterly third, leaving the westerly third resting upon solid earth. The Court of Claims has found that the east caisson was stable when floated and was stable when it landed on the bottom of the river.

There is no difference of opinion between the members of our court upon the law of the case. The majority readily concede both that the memorandum of July 15, 1927, constituted an order and that the contractors might rightfully presume that the body of the caisson was proper in design and possessed the quality of stability. The entire question with relation to this claim is one of fact. The facts have been resolved by the court below in favor of the defendant. These findings are borne out by the record. There was no breach of the contract by the State. The judgment of the Court of Claims dismissing this item was proper and is affirmed.

McNAMEE and CRAPSER, JJ., concur; HILL, P. J., dissents, with an opinion, in which HEFFERNAN, J., concurs.

HILL, P. J. (dissenting). The claimant contracted with the State of New York to construct the two main piers of the Mid-

Hudson bridge at Poughkeepsie. This appeal is from a judgment of the Court of Claims disallowing the claim made against the State for the moneys expended in righting the eastern caisson or pier support. It had tipped over during the attempt to sink it. The caisson, a column of concrete, steel and timbers, had been sunk eleven feet into the bed of the river, the top being above high water. It was intended to sink it about eighty feet. From the time it touched the bed of the river it had listed to the west, varying from two feet on June 15, 1927, to a fraction of a foot on July twenty-seventh, when it suddenly tipped to the east, coming to rest at an angle of about forty-five degrees. Claimant asserts that the caisson was being sunk in the manner directed by the accredited representatives of the State, this being in accordance with the contract, but the design furnished by the State was impracticable and unscientific, and it tipped because of inherent instability resulting from an improper distribution of weight which fixed the center of gravity too high to counterbalance the buoyancy and upward thrust of the water, and thus, the State being at fault, it should bear the extra cost. The State answers that the design was proper and that the tipping was caused by the negligence of the contractors in dredging and manipulation. The structure was rectangular, with rounded ends, one hundred and thirty-six feet long and sixty feet wide. The perimeter wall was concrete three and a half feet thick. Longitudinal walls of concrete three feet thick and transverse walls two and a half feet thick divided the interior into twenty-five dredging pockets, five in each end of irregular shape, each having an area of approximately one hundred and sixty square feet, the remaining fifteen in three longitudinal lines, those adjacent to the outside walls having a dimension of twelve by twelve feet, the five through the center being twelve by twenty-four feet. The caisson was cast in vertical sections, the first or bottom section, twenty-one feet high, was cast on Staten Island. The extreme outside of its perimeter wall was incased in a steel jacket three-fourths of an inch thick. The lower edge of the wall, designed to come in contact with the bed of the river, was shod with wood beveled to a cutting edge. False bottoms constructed of large timbers braced from the interior were added to the pockets at the Staten Island plant, making it sufficiently seaworthy to permit towing up the river to the proposed location for the bridge, where it was anchored and also held in place by tugs and scows. The additional vertical sections, in all respects like the bottom section except that the outside steel jacket was replaced with wood, were added as the caisson floated in the river. Their weight caused the structure to sink lower into the water until eventually and about June it rested upon

the bed of the river, still with a false bottom at the lower extremity of each pocket. On July eleventh vertical sections had been added until the total height was seventy-nine feet, eight feet submerged in the river bed. Reliance was placed upon several agencies to effect the sinking of the caisson: the introduction of water into the dredging pockets to offset the buoyancy of that outside and to permit the unretarded pressure of the structure on the river bottom; the removal of the false bottoms from the dredging pockets, to permit the soil displaced by pressure to fill these pockets and to increase the downward tendency by concentrating the weight of the superstructure on a smaller area; finally by excavation of the soil under the caisson and its removal up through the pockets by means of dredging equipment.

It was intended to permit dredging through each of the twenty-five pockets, if necessary. No caisson as large had ever been so designed. The original plans contemplated that half the pockets should be available for dredging and half for loading, i. e., to be closed at the bottom and filled with a heavy substance which would increase the weight and correspondingly the tendency to sink, and also make for greater stability by lowering the center of gravity.

Lack of stability of the caisson disturbed the State's engineers and the contractors long before it rested on the river bottom. Claimant's vice-president, writing the engineers on May seventh, said: " There seems to be some question as to the stability of our caissons at Poughkeepsie. We have got one caisson to 30 feet draft and it apparently is not as stable as it was. I believe Mr. Moran intimated that when we were down 40 feet we would begin to see a variation of stability; and I would like to have the engineering figures from you on this matter of stability." The letter, further, discusses the necessity for ballast and concludes: " We can, of course, put in some stable ballast, which probably we would do rather than trust to the water. However, we should like to have the theoretical side of this question figured out, to see where we are at." On May ninth the State's engineers, writing the State's resident engineer, said they were considering the question of stability of the caissons and directed that the perimeter walls be carried up ahead of the interior walls. This would tend to keep the center of gravity low and permit the placing of ballast in the bottom of the caisson without submerging the entire structure. In the letter it is stated: "As it becomes necessary ballast consisting of sand or gravel should be placed in the pockets of the caisson." On the fourteenth of the same month the engineers wrote to the

contractors directing that three feet of sand ballast or equivalent be placed in the east caisson, the letter stating: " In our opinion this ballast should be placed at once and certainly not later than Tuesday, the 17th. Please give this your earnest attention." When the east caisson came to rest on the river bottom, there was a list of two feet to the west. The list continued, being gradually reduced to a fraction of a foot on the evening of July twenty-sixth. The sudden tipping to the east occurred on that night. There was also a second listing of eight-tenths of a foot to the north. At claimant's request, the court found: " On the afternoon of June 15, 1927, at a time when the list of the east caisson was 2 feet to the west, the contractor dredged for several hours along the river bottom, outside of the northeast cutting edge of the east caisson, in the hope that this might eliminate or reduce the said 2-foot list to the west." With the same evident purpose, the contractor, between July seventh and twelfth, removed the bottoms from three alternate pockets on the east side of the caisson. The bottoms were removed from two center pockets on July thirteenth and fourteenth.

The State Superintendent of Public Works urged the necessity of speed upon the contractor by a letter of June sixth. The engineers in charge did likewise on June eighth. On June tenth the contractor, replying, recited the difficulties that arose through instability. The letter says: " We have had a good deal of experience in sinking caissons, but never before as large a one as these, nor so designed, with no cutting edge and with no stability; and the paramount idea in our minds is the safety of these caissons." The letter terminates: " I am writing you at length so that you may know the exact position we are in. We are doing the work in a great measure regardless of expense, our only idea being to make time, but we are in a position right now where we think safety is the governing feature, though we hope soon to be over that part of the work and can then go the whole thing to the limit." On July eleventh the east caisson had sunk into the river bed only about eight feet, with seventy feet yet to go. The State Superintendent of Public Works summoned the State's engineers and the contractors to a conference on July fifteenth. The result was summarized in the following instructions: " Mid-Hudson Bridge — Conference at Poughkeepsie July 15, 1927. Conclusion; — East Caisson. (1) Continue removing bottoms. (2) When the bottoms removed on west side correspond to the open pockets on the east side, begin dredging in pockets and continue dredging until it is safe to remove more or all pockets." The Court of Claims has found: " The conclusions above set forth constitute an order to the claimant from the State of New York's accredited representative, which order

the claimant was bound to follow and comply with." The court also found that on July eleventh the contractor had already removed the bottom from pocket 11. This is located on the southwest corner of the caisson. On the day of the conference the contractor removed the bottom from another pocket on the west side. Difficulty was encountered in removing the bottoms which were covered by the 600 tons of sand ballast placed by direction of the State in an attempt to make the caisson stable. However, before July twenty-sixth, by the use of dynamite, holes had been punctured in the bottoms of two additional pockets and a third entirely removed, all on the west side. Thus before the accident claimant had obeyed the order that bottoms be removed on the west side to " correspond to the open pockets on the east side," and, further, was following the order by continuing to dredge. During the same period bottoms were removed from three center pockets, and on the night of the accident the contractor was also dredging from these. This was specifically approved by an expert who was in the regular employ of the New York Port Authority, but who had been called in during the month of May by the State's engineers Modjeski and Moran. He was requested to examine the work on this pier and report. He made several visits and reports, attended the July fifteenth conference, visited the pier on July twenty-fifth, about thirty-six hours before the accident, and reported: " I arrived at Poughkeepsie at noon today. * * * Meantime, mud is being dredged from the center row of pockets in order that the caisson will be rim bearing and not have a tendency to tip either way except as influenced by the dredging. I will endeavor to go up again Friday if other matters will permit." Between July fifteenth and twenty-sixth the caisson had sunk only one and eight-tenths feet.

The State's position is epitomized with graphic laconism by the Court of Claims in one of its findings: " The caisson listed because there was a hole dug under one side of it and the caisson fell into the hole." In examining the proof to find support for this, we should keep in mind that the total bottom area of the caisson with all the false bottoms in place was 7,380 square feet, and that it had been sunk eleven feet into the bottom of the river, displacing 81,180 cubic feet (almost exactly 3,000 cubic yards) of soil in the bed of the river. Considering the depth of the excavation underneath the three easterly open pockets and the five center pockets, a comparatively negligible amount of this displaced earth had been dredged and removed, thus of necessity it had risen about the outside of the caisson. The State points to the dredging on June fifteenth earlier mentioned, as providing the hole. It will be recalled that the court has found this work was done in an effort

to prevent disaster by overcoming the list of two feet to the west which existed when the caisson landed on the river bottom. It was found to be " a trench 60 feet long, approximately 8 feet wide and 9 feet deep adjacent to the caisson in the vicinity of pockets 2, 3 and 4 [these are located on the easterly side] and from which about 150 cubic yards of earth was excavated." At the time of the disaster the caisson had sunk eleven feet into the river bottom, and was two feet below the bottom of this trench, even if we assume that none of the earth displaced by the sinking had found its way into the trench. In relation to the caisson no hole remained. The only effect of the June fifteenth dredging was to lower the lateral support of earth at the side of the caisson. A structure of this size could not have fallen into the hole twelve by twelve and fifteen feet deep underneath one of the eastern pockets. The other two " holes on the east side " each have dimensions of twelve by twelve feet, one three feet deep and the other five. There were only 277 yards of earth excavated from all three of these east side pockets. In both the written and oral arguments of the State it is suggested that the excavations under all the pockets had united through saturation of the clay which separated them. This has no support in the evidence beyond theory and speculation, which I believe disappears with analysis. Seven hundred and seven cubic yards in the aggregate had been excavated from the east and center pockets. A part of this excavation had occurred before the caisson had sunk the entire eleven feet, and with that yardage distributed over the area involved, it would have produced little more of a list than the caisson had to the west when it first landed on the river bottom. I can give no consideration to the theory that the holes excavated under the several pockets joined with the sixty-foot trench adjacent to the northeast corner of the caisson, as its bottom was two feet above the level at which the caisson was standing. The nature of the soil displacement under the caisson at the time of the tipping is not disclosed in the evidence, it is unknown, probably unknowable, but as I view this case, it is of little importance, for the contract under which this work was being done provided: " The determination of the engineers, with the approval of the State Superintendent of Public Works, in relation to all matters connected with this contract shall be final and binding upon the contractors. * * * The engineers may stop, by written order, any work or any part of the work under this contract if the methods or conditions are such that unsatisfactory work might result. * * * The accurate location in plan and the vertical alignment of the piers is a matter of the utmost importance. The contractor shall use all necessary precautions and adopt such

measures as the engineers may direct to gain the desired results. The work shall be so accurately conducted that at no time shall any part of the caisson be more than one (1) foot from its true position. Should this limit be, at any time, exceeded, the contractor shall employ such remedial measures as the engineers may consider necessary." The Superintendent of Public Works and the engineers, after a conference and consideration, gave specific directions and those were being followed. Bottoms having been removed equally on the east and west sides, the contractor was instructed to dredge. Good sense required that no dredging be done on the west side as the structure was listing in that direction.

Under the conditions disclosed in this case, our authorities require that the unquestioned expenditure incurred by claimant in the righting of this pier should be borne by the State. (*Faber* v. *City of New York*, 222 N. Y. 255; *Borough Construction Co.* v. *City of New York*, 200 id. 149; *Gearty* v. *Mayor, etc., of New York*, 171 id. 61; *MacKnight Flintic Stone Co.* v. *Mayor, etc., of New York*, 160 id. 72.) These authorities are sustained by the dictates of fairness and equity. The State embarked upon this large project for the convenience of the public, with the hope of financial gain which, according to common reports, has been realized from the tolls charged for the use of the bridge. The contractor was subject to a control that was exercised by the State's accredited representatives. They determined the exact type and design of the caisson, they directed the manner in which the work of sinking should be done. The untoward tipping was an incident unexpected, but within the limits of possibility in this venture. The expense of correction should be paid as an extra labor item.

I favor a reversal of the judgment of the Court of Claims in so far as it disallowed the item for the work of righting the pier, and a judgment in favor of the claimant for the amount of the claim, with costs and interest.

HEFFERNAN, J., concurs

Judgment affirmed, with costs.