AMERICAN BRIDGE COMPANY, INC., Respondent, *v.* THE STATE OF
NEW YORK, Appellant.

(Claim No. 22184.)

Third Department, November 20, 1935.

*John J. Bennett, Jr., Attorney-General* [*Leon M. Layden, Second Deputy Attorney-General,* and *Edward E. Brogan, Assistant Attorney-General,* of counsel], for the appellant.

*Kenneth B. Halstead* [*H. Bartow Farr, Arthur L. Mulling* and *James E. Carroll* of counsel], for the respondent.

HEFFERNAN, J. The State of New York has appealed from a judgment of the Court of Claims in respondent's favor in the sum of $62,783.11. There is no controversy regarding damages, the parties having stipulated that if respondent is entitled to recover at all then the amount for which judgment was rendered is correct. The sole question, therefore, is one of liability. The facts are undisputed and only questions of law are presented for determination.

On March 11, 1927, respondent and appellant entered into a written contract, dated on that day, whereby respondent, in consideration of payment therefor by appellant, agreed to furnish all the materials, appliances, tools and labor necessary to construct and complete the superstructure and uncompleted portions of the approach and anchorages of the Mid-Hudson bridge at Poughkeepsie, N. Y., in accordance with the plans and specifications thereto relating.

The substructure of the bridge involving the completion of the east pier was constructed under a separate contract between appellant and Blakeslee Rollins Corporation. Respondent could not proceed with the performance of its contract until the other contractor had completed the substructure. The contract provided that the substructure of the bridge should be ready to receive the superstructure by September 1, 1927, on which date the respondent was required to commence the erection of the superstructure on the east pier and complete it on February 1, 1928. The piers were to be constructed upon caissons in the river and the work proceeded satisfactorily until June 27, 1927, on which date the east caisson tipped, owing to the negligence of the contractor having that work in charge. (*Blakeslee Rollins Corporation* v. *State of New York,* 239 App. Div. 571; affd., 265 N. Y. 567.)

Prior to the tipping of the caisson, appellant's Superintendent of Public Works, the official who had charge of the building of the bridge and who executed on behalf of appellant the contracts for its construction, notified respondent that he expected it to complete its work not later than November 1, 1928, being the date fixed in the contract. Following the tipping it became apparent to all that the

east pier would not be completed in time to receive the superstructure on September 1, 1927. No one at that time could tell exactly how long it would take to right the pier, but the appellant's engineers estimated that the delay would not exceed ninety to one hundred days. This estimate proved to be quite erroneous. As a matter of fact the delay was twenty-one months and the east pier was not ready until June 4, 1929.

The court below has found, and the finding is not questioned, that all the delays were caused by the operations of the pier contractor. The contract contained the following provision relating to delays: " It is anticipated that the main piers will be sufficiently completed to permit the erection of the towers to be started on the dates above given. In case of delay in such dates, the contractor will be given a corresponding extension of time in the dates of completion. It is expressly understood and agreed that no claim shall be made against the State for any damage due to delays in the completion of the Main Piers which are constructed under another contract."

The whole controversy centers around the construction to be given the quoted portions of the contract.

On September 1, 1927, a conference was had at Poughkeepsie between appellant's Superintendent of Public Works and a representative of respondent to determine what should be done. The most important question to be settled was whether, in the face of the delay, respondent should nevertheless proceed to fabricate the required steel, a large part of which was not required to be delivered at the site until a substantial time after the commencement of respondent's work. The decision was especially important because, if the fabrication proceeded in the face of the delay, the fabricated steel would have to be stored until erection could begin. Appellant's superintendent was informed that it could not be stored at respondent's plants because it had no facilities for storage. Both parties knew that it could not be stored at the site because there was no room there. Nevertheless, appellant's superintendent directed respondent to proceed with the fabrication of all the steel to be furnished under the contract, although all further work thereunder was necessarily deferred until the caisson was righted.

Respondent started the erection of the superstructure on the east pier on June 13, 1929. While the west pier was ready in the spring of 1929 the parties agreed to a postponement of the erection of the superstructure on that pier because it was advisable to proceed with the erection on the two piers simultaneously in view of the connecting cables between the two towers. The completion of the work was extended from time to time until December 8, 1930.

Respondent, however, completed its work before that date, and in fact the bridge was opened August 25, 1930.

The early fabrication done under the direction of appellant's superintendent occasioned the expenses for which judgment has been awarded. There were two consequences: (1) Expenses of storage, and (2) deterioration of paint on the stored steel, requiring extra painting. Appellant's superintendent, testifying on respondent's behalf as to these items said:

" The result was, your Honor, that they proceeded with due diligence and when the time came the steel was fabricated at their plants, began to crowd up there and they had to move it. We had no place at the bridge site so they brought the steel to the railway yard in New Jersey near Jersey City and it was piled up there. And then in spite of everything that every one could do that pier did not begin to right, and finally when it did begin to right, we finally got a movement on it,— it would only move about a tenth of a foot, a little over an inch a day at first and then gradually picked up.

" Now the steel that they had piled up there had to be out in the weather and when we inspected it we found it was beginning — the shop coat of paint was beginning to fall off so we directed them to immediately repaint the steel. Now, to do that they had to pick up each bar. They probably could paint the top bars, but at least had to turn those over and then pick up each bar and paint it, and as I say, finally 21 months after the time when they were supposed to begin the erection of the steel they were finally able to begin.

" *Now it is one of those cases that comes up very rarely, where I am frank to say that this is a just claim*, but owing to the restrictions of the law we could not pay it outright so that they were forced to come into the Court, and if you will permit me I would like to put this on the record, that in my long experience in Albany I never done business with any company which co-operated more fully with the State and showed a fairer spirit. In fact, if I continue there I shall always be glad when the American Bridge Company are the successful bidders for the State because I know we will get a good job and get it right."

Appellant contends that the clauses in the contract which we have quoted, taken in connection with the fact that respondent's time to complete its work was accordingly extended, are a complete defense to this cause. Respondent asserts that its damage was not caused by the delay but by the active and unnecessary interference of appellant in directing that fabrication proceed when delay was obvious and that such direction was an active interference with respondent's operations and constitutes a breach of contract.

The parties have stipulated that the early fabrication of the steel resulted in the damages in question. The provision in the contract whereby respondent agreed not to claim damages relates solely to " any damage due to delays in the completion of the Main Piers which are constructed under another contract." This language is perfectly clear in meaning and definitely limited in scope. It anticipated the possibility that completion of the main piers might be delayed and it specified that in such event respondent could make no claim for damages due to such delays; its time to start and complete the superstructure would be correspondingly extended. Appellant insists that the delay was within the contemplation of the parties. Appellant of course did not cause the delay. It seems to us that appellant has misapprehended the position of respondent. The latter is not claiming damages because of the delay but because of appellant's interference with the work. The language of the clause relating to delay shows that the State had in mind delay due to failures or difficulties arising from the necessarily precedent work to be done by another contractor " under another contract," and it sought freedom from liability for damages resulting from such delay. The damages for which respondent was awarded judgment were not caused by delay in the pier construction, nor by failure to give respondent the site at the anticipated date, but by the act of the State in directing that fabrication proceed despite the delay. It cannot be disputed that the cause of the early fabrication, which resulted in the damages, was the act of the State in requiring it. The language exempting the State from damages due to delays in the completion of the piers was intended to eliminate only claims by a contractor who was left free to take advantage of the extension provided in the contract corresponding to the period of delay, and to govern his operations accordingly. Here the contractor was not left free to make its own decisions as to the best method of minimizing the damages caused by the delay. It was instructed by the Superintendent of Public Works to proceed with the fabrication without delay. A clause in the contract intended to apply to inaction forced upon this respondent by delays of another contractor, is now urged as a protection against the consequences of an affirmative course of action required by the State. Nothing in the language of the clause affords foundation for such a defense. This defense is not only quite technical but also inequitable and should not be allowed to prevail against what the Superintendent described as a " just claim."

It cannot be disputed that the State's order to proceed with the fabrication was an active interference with respondent's operations. It is well settled that where the owner interferes with the contractor's

work and such active interference causes damage to the contractor, the contractor may recover the same from the owner. (*Mansfield v. N. Y. C. & H. R. R. R. Co.*, 102 N. Y. 205; *Gearty v. Mayor, etc., of New York*, 171 id. 61; *Borough Const. Co. v. City of New York*, 200 id. 149; *Waples Co. v. State of New York*, 178 App. Div. 357; *Feeney & Sheehan Building Co. v. State of New York*, 120 Misc. 240; *Johnson v. City of New York*, 191 App. Div. 205; *People ex rel. Powers & Mansfield Co. v. Schneider*, 191 N. Y. 523; *Collins v. State of New York*, 259 id. 200; *Uvalde Asphalt Paving Co. v. City of New York*, 196 App. Div. 740; *Litchfield Const. Co. v. City of New York*, 216 id. 517; *Ryder Building Co. v. City of Albany*, 187 id. 868.)

Appellant seeks immunity by arguing that there was no interference with the work because there was no stopping of the work by it. The tipping of the caisson necessarily stopped the work properly due under the contract; no formal order was required to effect this. It was automatic under the contract. It was the State's order to continue preliminary work in the face of necessary stoppage and postponement of the work on the project itself, which constituted the interference and which caused the damage. Not delay, but the requirement of unnecessary, premature, preliminary operations was the interference.

Appellant also takes the position that respondent's failure to make protest when the initial order was given constitutes a complete defense. The contract provides that if at any time the Superintendent of Public Works determined that the work was not being performed according to the contract or for the best interest of the State, he could suspend the work and complete it himself or he might cancel the contract and relet it, charging any excess cost to the contractor who failed to perform the work ordered. The contract also contains the following clause: " It is further agreed that so long as any lawful or proper direction concerning the work or material given by the engineers or the Superintendent of Public Works, or their representatives, shall remain uncomplied with, the contractor shall not be entitled to have any estimate made for the purpose of payment, nor shall any estimate be rendered on account of work done or material furnished until such lawful or proper direction aforesaid has been fully and satisfactorily complied with."

The phrases used in these provisions are quite indefinite. No contractor could be asked to determine at his peril whether any direction should be complied with and was for the best interest of the State or lawful or proper. There was no alternative except to proceed and comply with the order. The contract provisions

placed the Superintendent of Public Works in the dominant position in declaring what was for the best interest of the State and what was proper. Exercising advantage of this position the superintendent determined that the State's interest required fabrication to proceed. Respondent was not in a position to undertake the risk of non-compliance with the Superintendent's order. It was not called upon to set its judgment against the judgment of the Superintendent. The breach was not waived by proceeding without initial protest. It could not then be foreseen by respondent whether or not the delay would be such that the Superintendent's direction would entail extra expense. It may well be that, had the delay continued only for ninety days, most, if not all, of the extra expense would have been avoided. The Superintendent had taken the estimate that the delay would continue only for such a time and upon such estimate had issued the direction to proceed. It would have required clairvoyance on the part of respondent to have then established that the order to proceed involved the consequences that later developed when the basis of the order was revealed to have been erroneous. If it had protested to any vigorous extent, the Superintendent could have accepted the protest as a refusal to proceed, thrown the contractor off the job, and relet the contract to others at the expense of the contractor. Respondent was not obliged to take this risk nor to set up its judgment against that of the Superintendent. Any other protest would have been wholly perfunctory and it is difficult to see what useful purpose it would have served.

Certainly respondent has not waived any rights because of its failure to protest, since, at the time of the direction, it had no knowledge, and no way of knowing, that the direction would lead to damages; had no such knowledge of the facts as would show any benefit to arise out of protest; was in no position to protest; had no intention to relinquish any right, being ignorant of the right, and did not in any way consent to be damaged without recompense; was put off its guard and misled, not only by its fear of penalties for failure to follow any " proper " direction of the State but by the State's estimate of the extent of the delay.

It is of the essence of waiver that there be an intentional relinquishment of a known right. ( *Kiernan* v. *Dutchess County Mut. Ins. Co.*, 150 N. Y. 190; *Draper* v. *Oswego County Fire Relief Assn.*, 190 id. 12; *Boyden* v. *Hill*, 198 Mass. 477; 85 N. E. 413; *Florence Oil & Refining Co.* v. *Reeves*, 13 Col. App. 95; 56 Pac. 674; *Josten Mfg. Co.* v. *Medical Arts Bldg. Co.*, 73 F. [2d] 259.)

It is doubtful also if the contract provisions relating to delay apply to a delay of over twenty-one months. Such clauses are

usually considered inapplicable to delays so great or so unreasonable that they may fairly be deemed equivalent to an abandonment of the contract. (*People ex rel. Wells & Newton Co.* v. *Craig*, 232 N. Y. 125.) Whether a delay is so great as to be beyond the contemplation of the parties to the contract is a question of fact to be determined in the light of all the surrounding circumstances.

The record discloses no meritorious defense against the claim in question and the judgment appealed from should be affirmed, with costs.

HILL, P. J., RHODES and BLISS, JJ., concur; McNAMEE, J., dissents, with an opinion.

McNAMEE, J. (dissenting). The question here is whether the State has been guilty of any wrongful act toward the claimant, from which it has waived immunity; and, therefore, whether it has become liable in damages to the claimant. The State made contracts for the construction of the Mid-Hudson bridge at Poughkeepsie. One of these contracts was for the substructure consisting of piers in the Hudson river; a second contract was made with the claimant for the erection of the superstructure to rest on the piers. The piers were to have been completed on September 1, 1927, and the superstructure on February 1, 1928. When partly erected one of the piers tipped. It was estimated by the officials of the State and the contractors involved that this pier could be righted in about one hundred days, but in fact it took twenty-one months. Claimant's work could not be commenced until the piers were in place, and its time for completion of its work was extended to December 8, 1930, three months longer than was necessary.

The original claim herein made against the State was verified January 21, 1932, was based upon the negligence of the State, and it was charged that " by reason of the failure of the State to perform its part of the contract in the preparation and completion of the substructure," the claimant was damaged. It was several years after this alleged failure that claimant reached the conclusion that it was not damaged by the negligence of the State in failing to deliver the site, but by an act wholly unrelated to the performance of its contract with the State.

The claimant now contends, and the prevailing opinion states, that the claimant was not injured by delay, but by the " active interference " of the Superintendent of Public Works with the conduct of claimant's business. Under its contract the claimant agreed to furnish all of the materials, machinery and labor for the erection of the superstructure on the piers. There is no provision in the contract specifying where or how the claimant should procure

these materials and this machinery. But the contract contained this provision: " It is expressly understood and agreed that no claim shall be made against the State for any damage due to delays in the completion of the Main Piers which are constructed under another contract." This provision makes evident the necessity on the part of the claimant to alter its claim.

The claim was accordingly amended in such a way as to allege that the claimant was *required* by the State to continue the fabrication of its steel for the superstructure without interruption, after the pier tipped, so as to have it ready for use on the site when the pier was ready. And because of this requirement, it is alleged, the claimant procured the fabrication of its steel sooner than was necessary for actual use in the bridge; and that this early fabrication necessitated storing the steel outdoors, and painting it a second time, and the consequent expense and damage. Of course, the contract in no way provided for the fabrication of the steel at any particular time before delivery; and no one suggests that any such written order was issued. The State was concerned only with the delivery of the steel on the site, and with its erection, as specified.

I have found nothing in the record, in either brief, or in the prevailing opinion, which points to any fact in support of the contention of the claimant. It is said and reiterated that statements made by the State's Superintendent, after the pier had tipped, furnish such support. When this accident occurred, a conference was held by those concerned in the contracts, and it was thought that work might again proceed in about three months. The testimony of the Superintendent, called as a witness by the claimant, was to the effect that he gave no order to discontinue the fabrication of the steel, but " asked " the claimant to continue the fabrication so as to be ready when the pier was righted and completed; and he answered affirmatively the leading question, whether he had not " instructed " the claimant accordingly. There is some other similar testimony to the same end. It is the facts related in this testimony that form the basis for claimant's judgment of $62,783.11. It is from the proof of these statements that the language of the judgment, the findings, the briefs, and the prevailing opinion, at varying places in the record, justifies the contention of the claimant that the Superintendent " requested," " instructed," " directed," " required," " insisted," and " ordered " that the steel in question be fabricated in anticipation of the time it was needed for use in the bridge.

It is true that the Superintendent of Public Works made many statements evidently intended to support the claim, but they had

nothing to do with the performance of the provisions of the contract. And after urging upon the court the excellence of the claimant as a contractor, and the justice of the claim, he admitted that " owing to the restrictions of the law we could not pay it outright." As I read the record, the Superintendent was correct in this latter particular, and I am persuaded that legally he could not pay the claim outright or otherwise.

It will be observed that the claimant rendered no service to the State of New York, nor did, nor refrained from doing anything for the State that was not required by its contract. It is clear that the contract provisions, or the interests of the State, were in no way related to the place where, the time when, or the manner in which the claimant fabricated the materials to be delivered on the job as specified. The Superintendent gave no order in reference thereto in any manner permitted by the contract; and when he assumed to make " requests," or to give " instructions," if he did, as to the conduct of claimant's business prior to the time at which any interest of the State attached, they were personal acts for which the State was in no way responsible. The State's interests were defined by the contract. And the suggestion that the claimant contractor complied with the requests of the Superintendent, because of fear of retaliation or unjust treatment by the Superintendent if it did not, involves not only unjustifiable implications, but is without any support in the evidence. But if it were true that claimant's conduct was actuated by fear, it did not create a liability on the part of the State.

By section 12-a of the Court of Claims Act the State waives immunity from liability for the torts of its officers, and from all claims for injuries to person or property caused by the misfeasance or negligence of its officer, while acting as such, and assumes that liability. In so far as this case is concerned, it waived its immunity and assumed liability in no other particular. And section 26 of that act prohibits liability by implication, and prohibits awards against the State except upon legal evidence. Here the primary and evident cause of claimant's damages, as the claimant itself at first alleged, was the delay due to the tipping of the pier; and the State was in no way responsible for the tipping, or for the delay, because it was not due to the tort of a State official, and, in addition, the contract provided otherwise.

No official order was given touching the fabrication of the steel, nor was any requirement exacted with reference thereto, in any manner permitted by the contract. Even if a request, an instruction, or an order of the Superintendent were actually given or made in the manner prescribed by the contract, or in any other substantial

manner, it in no way altered the obligation of the claimant to have the steel ready when required. The time, place or the manner of fabrication of the steel specified was not provided for in the contract, and the State had no interest therein prior to delivery. The Superintendent of Public Works cannot bind the State, even if he wishes to do so, as to matters with which the State is not concerned.

By a divided court we have already held (and the Court of Appeals unanimously affirmed the holding) that the tipping of the pier mentioned was not the fault of the State, but of the contractor who erected it; although that case was decidedly more plausible than the one at bar. There the same kind of a claim was made, and the same grounds alleged as here, viz., that the contractor was improperly directed by the Superintendent to follow a course which resulted in damage. (*Blakeslee Rollins Corporation* v. *State of New York*, 239 App. Div. 571; affd., 265 N. Y. 567.) In that case, although this court held that the written instructions were an order given by the Superintendent to the contractor, but disobeyed, the Court of Appeals did not indicate in its decision that it regarded the writing as an " order " within the contemplation of the contract. Of course, whether there was no order, or an order disobeyed, the legal effect would be the same. That order, if it were one, was in writing, had to do with and was given in the progress of the actual work on the site. In this case the alleged request or instruction was not in writing, had nothing to do with the work on the site, and it had neither substance nor form to give plausibility.

There is no proof in the record that the State violated its contract, or interfered with its performance, or that any State official was guilty of any tort, misfeasance or negligence while acting as such officer. The judgment should be reversed, and the claim dismissed.

Judgment affirmed, with costs.