**TRICON KENT CO., Plaintiff–Appellee,**

v.

**LAFARGE NORTH AMERICA, INC.; Lafarge West, Inc.; and Safeco Insurance Co. of America, Defendants–Appellees.**

No. 06CA0595.

Colorado Court of Appeals, Div. II.

May 1, 2008.

Berg, Hill, Greenleaf, & Ruscitti, LLP., Daniel M. Gross, Heidi C. Potter, Boulder, Colorado, for Plaintiff–Appellee.

Wells, Anderson, & Race, LLC, Larry S. McClung, Denver, Colorado, for Defendants–Appellees.

Preeo Silverman Green & Egle, P.C., Gilbert R. Egle, Denver, Colorado, for Amici Curiae American Subcontractors Ass'n, Inc. and American Subcontractors Ass'n of Colorado.

Opinion by Judge ROTHENBERG.

### I. Background

In 2003 and 2004, Lafarge was the general contractor for a highway construction project in Douglas County, Colorado, involving the regrading and resurfacing of State Highways 83 and 86. The project was supervised by the Colorado Department of Transportation (CDOT), and Lafarge sought bids from subcontractors to perform the earthwork on the project. Tricon was the successful bidder, and in March 2004, the parties entered into a subcontract drafted by Lafarge. It provided, as relevant here, that Tricon agreed to work "in accordance with the terms and provisions of the Contract between the Owner [CDOT] and Contractor [Lafarge], including all general and special conditions, drawings, specifications and other documents."

The subcontract also included a clause commonly referred to in the construction industry as a "no damages for delay" clause. It provided:

Section 6. Delays. (a) In the event the Subcontractor's performance of this subcontract is delayed or interfered with by acts of the Owner, Contractor or other Subcontractors, he may request an extension of time for the performance of same, as herein provided, but shall not be entitled to any increase in the subcontract price or to damages or additional compensation as a consequence of such delays or interference, except to the extent that the prime contract entitled the Contractor to compensation for such delays and then only to the extent of any amounts that the Contractor may, on behalf of the Subcontractor, recover from the Owner for such delays.

This action arose because the parties could not agree on the amount of Tricon's final compensation. Tricon alleged in its complaint that Lafarge breached the express and implied covenants of the subcontract, including the implied covenants of good faith and fair dealing. According to Tricon, the scope of its work was changed during the performance of the subcontract because of Lafarge's failure to schedule and sequence the project in accordance with the requirements of the prime contract and with the ordinary custom and practice in the industry. Tricon maintains that Lafarge's interference with Tricon's performance of the subcontract caused it to encounter significant obstacles and costly delays.

At trial, Tricon presented evidence that its estimator and project manager prepared its bid after reviewing the contract between CDOT and Lafarge and used the project plans and specifications for Tricon's calculations. The bid documents in the CDOT–Lafarge contract included the project phasing plan, which contained important information regarding the construction project, including the anticipated construction sequence, conditions under which the work would be performed, and the work zones that would be available during a particular phase. According to Tricon's witnesses,

CDOT's phasing plan was crucial in Tricon's bid preparations and planning because it divided the earthwork into two segments of the job and helped Tricon determine where fill material would come from and the type of equipment to use.

Under CDOT's phasing plan, a new phasing lane was to be built first and while it was under construction, traffic was to flow in two lanes next to the work zone where earthen fill and retaining walls were being built. The retaining wall was to be constructed by another subcontractor, 5L, and the traffic was then to be switched to the eastbound side of the road. The last phase involved paving all three lanes with a final layer of asphalt, grading, landscaping, and installing guardrails.

The phasing plan showed that Tricon's truckers would have access to the job for hauling material because of the two open lanes and because CDOT required that a specially engineered, imported material, R–50, be placed on top of the fill. Tricon had estimated the amount of this material that would have to be trucked to the project, and Tricon's witnesses testified that before beginning work, it had submitted a method statement to Lafarge as required by CDOT's specifications; that the method statement tracked the phasing plan and categorized Tricon's work based on which side of the road was under construction; and that it also detailed the production rates and the amount of time the work would take.

CDOT's plan also called for native earth to be used on both sides of the roadway and a layer of R–50 to be placed on top of the fill. According to Tricon's estimator, approximately 10,000 cubic yards of R–50 was needed for this project, and the subcontractor performing the earthwork had to truck it in from a pit. Tricon presented evidence that it had to conduct earthwork operations in the midst of traffic and with different equipment than anticipated. Tricon also presented evidence that CDOT's design required the retaining wall to be built by 5L before Tricon could place the fill on top of it, that Lafarge could not begin paving on top of the R–50 layer until Tricon's earthwork was complete, and that the new passing lane could not be

used for traffic until the paving was in place. Tricon's superintendent testified that he was concerned about 5L's slow progress, that he repeatedly notified Lafarge's on-site project manager that the new passing lane could not be completed until 5L had finished its construction of the retaining wall, and that he also notified Lafarge about Tricon's need for better access for its trucks.

Tricon introduced correspondence from Lafarge establishing that Lafarge knew 5L had to complete its work before Tricon could proceed, and that Lafarge nevertheless directed Tricon to proceed and threatened to seek liquidated damages if Tricon did not do so. There was also evidence that 5L did not complete the retaining wall until late September 2004; that Lafarge decided not to open the project to two-way traffic; and that if the phasing plan had been followed, Tricon's work area would have been larger and its access to the project considerably greater. Tricon's witnesses testified to similar problems on the westbound shoulder work, which required Tricon to use smaller equipment in the work area, because it was more confined than as shown in the phasing plan.

In a letter dated December 17, 2004, Tricon sought additional compensation from Lafarge based on alleged delays relating to the construction of the retaining wall and traffic lane closures. Lafarge requested more documentation from Tricon, but after receiving it, Lafarge denied the claim, maintaining that such compensation was precluded by the "no damages for delay" clause in the subcontract. At the end of the project, CDOT also assessed Lafarge twenty-seven days of liquidated damages for the entire project, and Lafarge passed on to Tricon the liquidated damages for three of the twenty-seven days. Tricon denies responsibility for those damages.

The parties disagreed whether, during a preconstruction conference, Tricon had received a schedule from Lafarge showing a different sequence than the one Tricon claimed existed. Lafarge also contended that until Tricon's December 2004 letter, Tricon had not asked for additional compensation for delays relating to the wall, and that its request was untimely.

After Tricon's case-in-chief, Lafarge moved for a directed verdict, contending the "no damages for delay" clause precluded any damages to Tricon as a matter of law; that Tricon's request for compensation was untimely and was barred by the notice provision of the contract; and that Tricon's numerous letters to Lafarge regarding the situation were insufficient notice. The trial court denied Lafarge's motion, stating:

> There are certainly factual disputes here ... [s]uch as whether the difficulties ... encountered in the course of the project such as the construction of the retaining wall by 5L and difficulties with lane closures, whether those were or should have been within the original contemplation with the parties at the time of contracting, or rather were sources of additional costs, extensions of time, damages for delays as referenced in section 23 of the subcontract which requires that notice be given of that fact or those facts to justify either an extension of time or damages or additional costs or all of the above.

> It's also a jury question as to whether [Lafarge] changed the sequence of work in the phasings or whether [Tricon] was or should have been on notice of the scheduling of these other subcontractors such as 5L. It's a jury question of whether [Lafarge] is justified in holding back the balance due under the contract price.

> It is most likely a question of law as to whether section six, the no damages for delays clause[,] applies here but that can't be invoked until these factual issues are adequately resolved....

At the close of its case, Lafarge renewed its motion for a directed verdict. The court deferred ruling on the motion and said it would treat the motion as a post-verdict motion if necessary.

The jury returned a verdict in favor of Tricon and awarded it $29,276 on the contract balance and $144,600 for additional compensation. Lafarge did not file any posttrial motions, and the trial court awarded Tricon prejudgment interest and costs.

## II. Sufficiency of the Evidence

Lafarge contends the trial court erred in denying its motion for a directed verdict because the uncontroverted evidence established the existence of a valid and enforceable "no damages for delay" clause. Tricon contends that the "no damages for delay" clause is inapplicable, but that even if it applies, there was evidence that Lafarge's actions constituted "active interference" with the parties' contract.

We conclude "no damages for delay" clauses are valid and enforceable in Colorado; that active interference by an owner or contractor is a recognized exception to such clauses; and that Tricon presented sufficient evidence for the jury to find such interference by Lafarge. Thus, the trial court did not err in denying Lafarge's motion for a directed verdict.

### A. Standard of Review

In ruling on a motion for directed verdict, a trial court must consider the evidence in the light most favorable to the nonmoving party and draw all inferences in that party's favor. In general, we apply that same standard on review. *Fair v. Red Lion Inn,* 943 P.2d 431, 443 (Colo.1997). However, where a motion for directed verdict involves a question of law and undisputed facts, we review the trial court's ruling de novo. *Omedelena v. Denver Options, Inc.,* 60 P.3d 717, 722 (Colo.App.2002).

A motion for directed verdict should not be granted unless the evidence compels the conclusion that reasonable jurors could not disagree and that no evidence or inference was received at trial upon which a verdict against the moving party could be sustained. *Fair,* 943 P.2d at 436; *Salstrom v. Starke,* 670 P.2d 809, 811 (Colo.App.1983).

### B. Validity of the "No Damages for Delay" Clause

■ We are unaware of any published state court decision in Colorado addressing a "no damages for delay" clause. However, a federal appeals court in a case arising in Colorado and the majority of courts in other jurisdictions that have addressed the issue have generally upheld the validity of such clauses. *See W.C. James, Inc. v. Phillips Petroleum Co.,* 485 F.2d 22, 25 (10th Cir. 1973) (observing that "[s]uch clauses are commonly used in the construction industry and are generally recognized as valid and enforceable"); *Owen Constr. Co. v. Iowa State Dep't of Transp.,* 274 N.W.2d 304, 306 (Iowa 1979) ("Such clauses are defended [in cases involving public contracts] on the theory they protect public agencies which contract for large improvements to be paid for through fixed appropriations against vexatious litigation based on claims, real or fancied, that the agency has been responsible for unreasonable delays.")(citing *A. Kaplen & Son, Ltd. v. Hous. Auth.,* 42 N.J.Super. 230, 233, 126 A.2d 13, 15 (1956)); Maurice T. Brunner, Annotation, *Validity and Construction of "No Damage" Clause with Respect to Delay in Building or Construction Contract,* 74 A.L.R.3d 187 (1976 & 2007 Cum.Supp.)(collecting numerous state and federal cases upholding "no damages for delay" clauses); *see also In re Marriage of Bolding–Roberts,* 113 P.3d 1265, 1267 (Colo. App.2005); *Kohn v. Burlington N. & Santa Fe R.R.,* 77 P.3d 809, 811 (Colo.App.2003) (observing that when there are no Colorado decisions, we may look to other jurisdictions, including federal jurisdictions, for guidance).

Nevertheless, "no damages for delay" clauses have been strictly construed against owners or contractees because of the harsh results that may flow from the enforcement of such clauses. *See John E. Green Plumbing & Heating Co. v. Turner Constr. Co.,* 742 F.2d 965, 966 (6th Cir.1984) (applying Michigan law); *E.C. Ernst, Inc. v. Manhattan Constr. Co.,* 551 F.2d 1026, 1029 (5th Cir. 1977) (applying Alabama law); *Cunningham Bros., Inc. v. City of Waterloo,* 254 Iowa 659, 664, 117 N.W.2d 46, 49 (1962).

We are persuaded by these decisions, and we similarly conclude "no damages for delay" clauses are valid and enforceable in Colorado, but they are to be strictly construed against the owner or contractee.

### C. Exceptions to "No Damages for Delay" Clauses

■ Courts in other jurisdictions have recognized several exceptions to, or limitations

on, the general rule that a "no damages for delay" clause precludes the recovery of delay damages. The most widely recognized exception to the enforceability of such a clause is for fraud, misrepresentation, or bad faith. *See United States ex rel. Williams Elec. Co. v. Metric Constructors, Inc.*, 325 S.C. 129, 133, 480 S.E.2d 447, 449 (1997)(observing that "[o]f those cases addressing [the bad faith] exception, it appears to have been adopted in all but one jurisdiction").

Here, however, the only exception seriously argued in the trial court and to the jury was the active interference exception, which frequently has been applied where a contracting party has affirmatively or directly interfered with the work of a contractor or subcontractor. *See John E. Green Plumbing & Heating Co.*, 742 F.2d at 966–67 (applying Michigan law and observing that the contractor was "not arguing that it suffered damages from delay, but rather that it suffered damages from obstacles created by [the construction manager]" and "as a result of [the manager's] hindrances-failure to properly coordinate work on the project"); *Newberry Square Dev. Corp. v. Southern Landmark*, 578 So.2d 750, 751 (Fla.Dist.Ct.App.1991); *see also A.G. Cullen Constr., Inc. v. State Sys. of Higher Educ.*, 898 A.2d 1145, 1160 (Pa.Commw.Ct.2006) ("The government possesses a duty not to act in a way that will hinder or delay a contractor's performance.").

As a Pennsylvania court explained in *James Corp. v. North Allegheny School District:*

> Ordinarily, "no damages for delay" clauses are enforceable. However, Pennsylvania law recognizes exculpatory provisions in a contract cannot be raised as a defense where (1) there is an affirmative or positive interference by the owner with the contractor's work, or (2) there is a failure on the part of the owner to act [in] some essential manner necessary to the prosecution of the work. Thus, affirmative or positive interference sufficient to overcome the "no damages for delay clause" may involve availability, access or design problems that pre-existed the bidding process

and were known by the owner but not by the contractor.

938 A.2d 474, 484 (Pa.Commw.Ct.2007) (citation omitted).

We conclude, as did the trial court, that there was sufficient evidence for the jury to find that Lafarge's actions constituted "active interference" with Tricon's performance. This evidence included testimony that Lafarge (1) failed properly to schedule, sequence, and coordinate Tricon's activities on the project; (2) ordered Tricon to proceed with its work knowing that 5L had not completed the retaining wall, *see Gasparini Excavating Co. v. Pa. Tpk. Comm'n*, 409 Pa. 465, 476, 187 A.2d 157, 162 (1963) (owner held liable for delays where it instructed contractor to proceed despite lack of access to area because of another contractor's work); (3) threatened Tricon with liquidated damages if it did not perform the out-of-sequence work; and (4) knew Tricon needed two lane openings for efficient performance of its work, yet failed to provide it with open lane access. *See Grant Constr. Co. v. Burns*, 92 Idaho 408, 415, 443 P.2d 1005, 1012 (1968) (an order to a contractor to proceed in the face of the contractee's failure to schedule removal of utility facilities constituted interference); *Johnson v. State*, 5 A.D.2d 919, 920, 172 N.Y.S.2d 41, 43 (1958); *Am. Bridge Co. v. State*, 245 A.D. 535, 538, 283 N.Y.S. 577, 581 (1935)(an order to proceed in spite of a delay in other work constituted interference); *Seglin–Harrison Constr. Co. v. State*, 30 N.Y.S.2d 673, 676 (N.Y.Ct.Cl.1941) (state's occupancy of a building or use of a way prior to completion of the work constituted interference), *modified*, 264 A.D. 466, 35 N.Y.S.2d 940 (1942).

Contrary to Lafarge's contention, Tricon was not required to show bad faith in order to invoke the active interference exception.

The obligation of noninterference with a contractor's ability to perform "arises from the common law duties of parties to a contract to deal fairly and in good faith with each other." J. David Arkell, *Construction Disputes and Dispute Resolutions*, IC Colo. Methods of Practice § 56.15 (2008 update); *see Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo.1995). However, what constitutes "ac-

tive interference" in a given case has varied among jurisdictions and even within the same jurisdiction. *See* Steven B. Lesser & Daniel L. Wallach, *Risky Business: The "Active Interference" Exception to NoDamage–For Delay Clauses*, 23 Construction Law. 26 (Winter 2003) *(Risky Business); see also Pellerin Constr., Inc. v. Witco Corp.*, 169 F.Supp.2d 568, 583 (E.D.La.2001)(observing that the concept of active interference "has not attained any precise judicial description").

Lafarge relies on early cases holding that, to show active interference, the owner or contractee must commit "some affirmative, willful act, in bad faith, to unreasonably interfere with plaintiff's compliance with the terms of the construction contract." *Peter Kiewit Sons' Co. v. Iowa S. Utils. Co.*, 355 F.Supp. 376, 399 (S.D.Iowa 1973); *see U.S. Steel Corp. v. Mo. Pac. R.R. Co.*, 668 F.2d 435, 438 (8th Cir.1982) (adopting *Peter Kiewit* standard); *Phoenix Contractors, Inc. v. Gen. Motors Corp.*, 135 Mich.App. 787, 355 N.W.2d 673, 677 (1984)(same); *P.T. & L. Constr. Co. v. State*, 108 N.J. 539, 531 A.2d 1330, 1343 (1987) (same).

Later cases, however, have reached a different result, and commentators have acknowledged that, "the bad faith component of that definition has all but been eviscerated due to the recognition of a separate 'bad faith' exemption from a no-damage-for-delay clause." *Risky Business*, at 27; *see Williams Elec. Co.*, 325 S.C. at 134 n. 3, 480 S.E.2d at 449 ("As there is already a specific exception for bad faith, we decline to adopt so much of [the *Peter Kiewit]* definition as requires a showing of 'bad faith.'").

The jurisdictions that have adopted a modern version of the *Peter Kiewit* definition have held that a plaintiff contractor or subcontractor claiming active interference on the part of the defendant owner or contractee need only to show that the defendant committed an affirmative, willful act that unreasonably interfered with the plaintiff's performance of the contract, regardless of whether that act was undertaken in bad faith.

As the South Carolina Supreme Court explained in *Williams Electric Co.:*

A majority of courts also adopt an exception to a nodamage-for-delay clause in cases of direct, active, willful interference with the work of the contractor. This Court has recognized that where performance of a contract by the vendor is prevented by the vendee, the vendee may not take advantage of the delay. Such active interference effectually violates the implied obligation of fair dealing. Accordingly, we find this exception to be a logical extension of South Carolina law. [FN3]

FN3. [The general contractor] does not oppose adoption of this exception, but urges us to adopt the definition of "active interference" embraced by the Iowa court in *Peter Kiewit* [355 F.Supp. at 399] as follows: ["] ... to be guilty of 'active interference' ..., the defendants herein would have to have committed some affirmative, willful act, in bad faith, to unreasonably interfere with plaintiff's compliance with the terms of construction contract.... [U]se of the term 'active' to modify 'interference' ... clearly implies more than a simple mistake, error in judgment, lack of total effort, or lack of complete diligence....["] *As there is already a specific exception for bad faith, we decline to adopt so much of this definition as requires a showing of "bad faith." Trial courts of this state may, however, utilize the remainder of the Kiewit definition in fashioning an appropriate jury charge.*

325 S.C. at 134 & n. 3, 480 S.E.2d at 449 & n. 3.(emphasis added; citations and additional footnote omitted).

▬▬ We are persuaded by this reasoning and similarly conclude that a plaintiff contractor or subcontractor claiming active interference on the part of the defendant owner or contractee needs only to show that the defendant committed an affirmative, willful act that unreasonably interfered with the plaintiff's performance of the contract, regardless whether it was undertaken in bad faith. However, we further conclude that, while it is unnecessary to show bad faith or reprehensible conduct, active interference requires more than a simple mistake, error in judgment, lack of total effort, or lack of complete diligence. *See Peter Kiewit*, 355

F.Supp. at 397; *Risky Business,* at 27. The trial court should give the jury an instruction to that effect where active interference is raised as a defense to a "no damages for delay" clause and sufficient evidence is introduced to warrant such an instruction.

In summary, we conclude the trial court did not err in denying Lafarge's motion for a directed verdict because there was sufficient evidence from which the jury could find that Lafarge actively interfered with Tricon's performance of the contract.

Given our conclusion, we need not address the viability in Colorado of any other exceptions to or limitations on "no damages for delay" clauses, nor do we address Tricon's argument that its claim was based on changes to the subcontract.

### III. Instruction on Liquidated Damages

■ Lafarge also contends the trial court abused its discretion in giving the jury an instruction on liquidated damages. Lafarge objected to the instruction at trial, contending that it was unsupported by case law and that it also was confusing and misleading. The trial court concluded that there was evidence presented about the liquidated damages assessed by CDOT and its per diem calculation, and that the jury had to consider it. We agree with the court.

■ A trial court has substantial discretion in formulating jury instructions so long as they include correct statements of the law and fairly and adequately cover the issues presented, *Taylor v. Regents of Univ. of Colo.,* 179 P.3d 246, 248 (Colo.App.2007), and we will not reverse a trial court's decision to give a particular jury instruction absent an abuse of that discretion. *Fishman v. Kotts,* 179 P.3d 232, 234 (Colo.App.2007).

Here, the trial court gave the following instruction to the jury regarding liquidated damages:

> If you find in favor of Tricon on its breach of contract claims against Lafarge, you must also consider whether Tricon's damages should be reduced for liquidated damages assessed by the Colorado Department of Transportation (CDOT) against Lafarge under the prime contract between Lafarge

and CDOT. To reduce Tricon's damages for such liquidated damages you must also find that:

1. Lafarge's performance time of the prime contract was extended as the result of improper performance by Tricon; and that

2. CDOT assessed liquidated damages against Lafarge for the time period that the project was extended; and that

3. The extended performance time of the project resulted from Tricon's improper performance and was not caused, in whole or in part, by the actions or fault of Lafarge or others for whom Lafarge was responsible.

If any of these propositions has not been proved, then Lafarge is not entitled to lessen Tricon's damages.

*See City of Westminster v. Centric–Jones Constructors,* 100 P.3d 472, 481 (Colo.App. 2003) (holding that a "liquidated damages" clause addressing delay in a construction contract will not be enforced "where [the] delay is due in whole or in part to the fault of the party claiming the clause's benefit" (quoting *Medema Homes, Inc. v. Lynn,* 647 P.2d 664, 667 (Colo.1982))).

The jury found that Lafarge had breached the parties' contract, that Tricon had been damaged, and that its damages were caused by Lafarge's breach. There was no finding by the jury of any improper performance by Tricon. Thus, any error in giving this instruction was harmless. *See Martin v. Minnard,* 862 P.2d 1014, 1017–18 (Colo.App.1993) (any error in failing to instruct on negligence per se was harmless where jury found plaintiff had not suffered any injury or damages).

The judgment is affirmed.

Judge FURMAN and Judge J. JONES concur.