R. H. BAKER Co., INC., Appellant, *v.* STATE OF NEW YORK, Respondent. (Claim No. 21927.)

Third Department, May 10, 1944.

*McClung, Peters & Simon,* attorneys (*Charles B. Sullivan* of counsel), for appellant.

*Nathaniel L. Goldstein, Attorney-General (Orrin G. Judd, Solicitor-General; Henry S. Manley, Assistant Attorney-General,* of counsel), for respondent.

HEFFERNAN, J. Claimant appeals from a judgment of the Court of Claims dismissing its claim for damages arising out of alleged wrongful acts and interferences by the State during performance of its contract for furnishing and installing a heating system and service piping in power house and connecting tunnels at Wassaic State School.

In November, 1927, the State began building a new institution at Wassaic through a contract with Seglin-Harrison Construction Company, Inc. (hereafter referred to as Seglin) for the erection of twenty-two buildings for inmates. Seglin's contract designated November 1, 1929, as the date for its completion.

Concurrently, in November, 1928, the State let two separate contracts, one to Morris Kantrowitz to build a power house, and about 11,000 feet of main concrete tunnels extending from the power house in a prescribed course about the building site, with branch service tunnels to the buildings then in course of erection by Seglin, and the other contract to claimant to place the heating equipment inside the power house, and the piping system inside the tunnels, which Kantrowitz was to build to house the same. Each contract designated November 1, 1929, as the date for completion.

Kantrowitz began work at the power house site on November 19, 1928, and started tunnel excavation on April 16, 1929, but did not entirely complete the power house and tunnels until October, 1930.

Claimant commenced preparatory work in March, 1929, and actual work of installation during the week ending May 11, 1929, and completed its work by August 30, 1930.

The claims for damages, consisting principally of increased labor costs, arose from the State's active interferences with claimant's assembly operations, through mandatory orders compelling claimant, over its protests, to begin, and to continue, and to complete its assembly work in tunnels, when the tunnels had not been, and were not being, constructed or progressed either in the usual manner or in such way that claimant's subsequent installations, which were to be placed *inside completed tunnels,* could be done by work methods customary in such industry.

Claimant was compelled to commence and continue assembling the piping system, within short, disconnected sections of tunnel, which Kantrowitz was permitted to build in different places about the site, without any known program therefor, whereby claimant could be advised, either before commencing its work, or while it was being compelled to follow up the disorderly tunnel building, concerning the plan according to which the tunnels would be constructed.

Kantrowitz was permitted to wholly abandon an initial program for continuous building of the principal main tunnel from the power house to the far corner of the site, which had been agreed upon in February, 1929, at a meeting at the site between

Kantrowitz, claimant and the State's engineer in charge. This known program for orderly tunnel building was agreed upon about two months before any tunnel excavating work was commenced. This program was wholly abandoned by Kantrowitz in April at the outset of excavating for tunnels, up to which time claimant had only been engaged in preparatory work, arranging for the manufacture and successive deliveries of the special materials which would be required in anticipated order of tunnel building, in accordance with the predetermined program.

Before sites for claimant's assembly work within tunnels were in such stage of construction and in such condition as to permit of assembly work therein by usual methods, claimant was compelled to proceed with its work, closely following up the tunnel building, as many short pieces of discontinuous tunnel were built about the site. These requirements were continually imposed upon claimant with notification that it would be held to its contract completion date, and that the heating system would have to be completed to be available for use in supplying temporary heat the coming winter for the buildings Seglin was constructing.

Claimant's contract contained no reference to Seglin's contract. Claimant had no obligation to have the heating system available for Seglin's use for temporary heat. It had no obligation to have it completed for the State's use for any purpose, except as arose from the date designated in its contract for completion of its work. Nevertheless, to accomplish an objective, wholly outside of claimant's contractual obligations, the State not only compelled claimant, over its protest to start, and to continue its assembly work in structures unsuitable for customary work operations, but ultimately compelled claimant to precede the work of the general construction contractor, completing and connecting the piping and heating systems in places with temporary installations, where tunnel gaps still existed, and in an incomplete power house, to make the system usable in February, 1930, for carrying steam for temporary heat to Seglin's buildings.

While claimant was being compelled to proceed, much general construction in tunnels and power house, which should have been completed in advance of claimant's work, in accordance with usual good construction practices, was wholly suspended by Kantrowitz during part of the winter in both power house and tunnels, and not completed until the following spring.

Claimant is entitled to recover its damages due to being wrongfully directed and compelled to carry on its assembly work when the structures which the State, through Kantrowitz, was to furnish to house the same, were not being so constructed, progressed and maintained that claimant's work could be done therein in accordance with customary methods of installing such heating systems. Such damages are directly due to the State's active interferences which precluded claimant's using customary economical methods in doing its work. The principle followed in *American Bridge Co., Inc.*, v. *State of New York* (245 App. Div. 535, 539) and cases therein cited is applicable here.

As a condition precedent to any right to require claimant to continuously follow up the tunnel builder's work in installing the piping system, the State owed claimant the duty of having the general construction work performed in such continuity or sequence as would allow claimant to assemble the system in completed portions thereof, by customary working methods, with some practicable program for its own operations.

In currently letting the two contracts with identical provisions reserving to the State the right of supervision over performance of both contracts, the State was obligated to have the required precedent construction work done in advance in some proper and orderly manner. Such duty had to be met by the State before it could rightfully require claimant to commence, and to continuously proceed with its work which was to be done in previously completed structures or parts thereof.

The State, through mandatory orders to proceed with its work, not only actively interfered with claimant's assembly methods, but failed to afford to claimant co-ordination of precedent general construction work to which it was entitled. (*Mansfield* v. *N. Y. C. & H. R. R. R. Co.*, 102 N. Y. 205, 212; *McEligot* v. *State*, 246 App. Div. 121; *Morrison & Quinn, Inc.*, v. *State of New York*, 204 App. Div. 623; *Brassil* v. *Maryland Casualty Co.*, 210 N. Y. 235, 241; *Wood* v. *Duff-Gordon*, 222 N. Y. 88; *Afgo Engineering Corp.* v. *State of New York*, 244 App. Div. 395, affd. 268 N. Y. 716; *Bird* v. *St. Paul F. & M. Ins. Co.*, 224 N. Y. 47; *Del Genovese* v. *Third Avenue R. R. Co.*, 13 App. Div. 412.)

An understanding of the methods customarily employed, and why they are employed, in procuring the tremendous quantities of prepared special parts to make up such heating and water systems, and in assembling the same inside tunnels, or sections thereof previously completed, is essential in considering the merits of this claim. The installation of such heating systems within tunnels is a highly specialized industry. Cus-

tomary working methods of contractors specializing therein were well known to the State.

The evidence shows that such work is rigging and assembling parts wholly prepared in advance, away from the site. Such assembling must be done after the general construction contractor has completed the piping contractor's site of work inside the tunnel and moved on. The methods of work are wholly different from those required in preparing materials on the job and placing concealed piping systems in buildings in the course of erection where the general construction work and the piping work must go along together.

The required assembly of heating and water systems within the tunnels amounted to seventy-five car loads of materials. Practically all had to be specially manufactured or fabricated for this job. The numbers of high, low and medium pressure steam lines, and domestic hot water and circulating water lines, varied between the main tunnel and smaller tunnels. Sizes of the different service pipes were reduced in sections as the distance from the power house increased. In its preparatory work, claimant had furnished the manufacturers and fabricators of these special materials with detailed schedules, covering the particular lengths, sizes and shapes of every part required to be assembled within the separately numbered tunnel sections, so that all materials could be made up and delivered in a given order and rotation, with each piece of pipe, and each special part stenciled, marked or tagged for installation between specified tunnel stations.

The evidence and the findings made by the court below establish that it is customary on projects like this to so schedule and release the pipings and fittings for shipment and delivery that they may be unloaded and directly distributed to the particular tunnel section for assembly without the necessity of temporary storage or rehandling.

The evidence and the findings made by the court below establish that it is customary on such projects to install the parts in a continuous assembly process — the successive operations involved in erecting pipe stanchions, placing and lining pipe, welding steam pipes, bolting flanged water pipes, testing and then covering pipe lines — each being carried on in a continuous line operation, by separate teams or crews, each experienced in their own particular assembly operation.

The evidence established and the court found that these customary methods of receiving the prepared parts and assembling the system are employed because they are more economical than discontinuous operations.

The court also found "that it is important that the piping contractor be advised before commencing his work concerning the plan according to which the tunnels will be constructed." The testimony and proof are that a predetermined program governing the order in which the tunnels will be built is vitally necessary, if the piping contractor may be expected to proceed currently with his assembly work, following up the tunnel builder, as completed sections ahead may afford a proper site of work so that he may receive and assemble the piping by customary methods.

Despite the fact that the program for first building the continuous large main tunnel throughout profile 1 from the power house to the most remote corner of the site had been agreed upon in February, 1929, and, in reliance thereon claimant had arranged for the manufacture and shipment on release orders of piping to go up profile 1, the State not only permitted Kantrowitz in April, 1929, to abandon this agreed program, but thereafter, over claimant's repeated protests, permitted him to construct the tunnels in short sections, in the several profiles, with no semblance of usual continuity in construction. The tunnels were, in fact, constructed in thirty or more discontinuous, disconnected operations, extending from April, 1929, to April, 1930. The evidence shows that the tunnel building was generally shifted about, back and forth from one location and profile to another, and that there was no reasonable continuity of construction except upon some short lengths of small subsidiary tunnels.

The evidence, and the findings already made by the Court of Claims also establish these facts:

(1) Kantrowitz first began tunnel operations on April 16, 1929, about 75 feet from the power house, excavating for a section of tunnel from Station 2 to Station 5 in profile 1. He completed this piece of tunnel only 110 feet long about April 30, 1929.

(2) Meantime on April 20, 1929, Kantrowitz notified claimant that he was next going to excavate for and build some sections of small tunnels in profiles 7, 8, 9 and 10. Claimant protested to the State's engineer in charge against such proposed abandonment of the agreed program, and against shifting to these smaller tunnels, stating that materials had been scheduled ahead and released for shipment to go up profile 1, that materials would not be available at the site to follow up shifts in tunnel construction, and that extra labor costs would be involved if piping installation could not proceed in continuity. The State's

engineer ordered claimant to follow up the construction of the tunnel with its piping, and that it must complete its work by November 1, 1929. This all occurred before claimant had commenced any assembly work whatever in the tunnels.

The court found that claimant repeatedly protested to the State's engineer against the subsequent changes in tunnel construction, which prevented continuity of work in piping installation, but was notified that it must follow up with its piping in sections of tunnels as they were completed, that it would be held to the completion date set forth in its contract, *and also that the heating system must be completed and made available to supply temporary heat for Seglin's use.*

The court has properly found that claimant had no obligation to make its heating system available to supply temporary heat to the buildings being constructed by Seglin.

Any obligation upon claimant to complete the heating system by November 1, 1929, was wholly dependent and contingent upon the State's having its independent contractor, Kantrowitz, so progress tunnel building in advance of claimant's assembly work inside completed tunnels as would afford claimant reasonable time to perform and complete its *subsequent work* by usual work methods.

Claimant's rights herein are not impaired by the fact that after February 15, 1930, when the heating system had been connected up, and was being used to provide steam for temporary heat for Seglin's buildings, claimant furnished at Seglin's expense the mechanics to operate the boiler.

The general conditions of claimant's contract provide: '' Article 30 — Temporary Occupation and Operation. 127. The contractor shall arrange for partial or complete occupancy, or the operation of the apparatus previous to final acceptance when directed by the Chief Engineer. He shall furnish the necessary skilled mechanics to remain in charge, but if he does not provide such men, the State shall have the right to occupy the buildings and to operate the apparatus at his expense, without assuming any responsibility arising from such action. The occupation or use of apparatus will not constitute acceptance of such work.''

After claimant, through mandatory orders of the State's engineer, had been compelled for nine months to follow up disorderly and disconnected tunnel building, and ultimately to precede the general construction work in tunnels and power house with its installation, under directions that the system must be made available for use for temporary heat to Seglin's buildings,

on January 30, 1930, the State's engineer called a meeting at the site with Seglin and claimant, and arranged that the heating system be put to use to supply the temporary heat — Seglin to furnish the coal and reimburse claimant only for wages of the mechanics who operated the boilers. The evidence is that claimant expressed disapproval of such plan at the meeting but was overruled.

Claimant gained nothing through this subsequent arrangement which the State dictates, under its claim of right "to operate the apparatus" by reason of the aforesaid general conditions of claimant's contract.

Claimant lost no rights through its enforced acquiescence, on January 30, 1930, in a plan which had evidently been worked out long before between Seglin and the State's representatives, whereby Seglin could gain the use of the State's central heating plant, and not be compelled to furnish boilers set up outside his numerous buildings to heat them. Seglin's contract with the State obligated him to furnish temporary heat for his buildings by a method which specifically required him to furnish and use his own temporary boilers.

Claimant owed no obligation to Seglin or to the State to get the heating system installed so it would be available for Seglin's use. The evidence also shows that the State had no contract obligation to ever permit Seglin's use of its heating plant.

The evidence clearly establishes that the State wrongfully compelled claimant to commence and continuously proceed with its installation work, in advance of proper precedent general construction work, to accomplish an objective wholly foreign to and beyond any contractual obligations.

While the State engineers were compelling claimant to put on extra forces and get the heating system connected up available for Seglin's use, some sections of tunnels were not completed. It was obvious that some gaps would remain until spring as Kantrowitz was permitted to stop tunnel building in January, 1930. Three tunnel sections, including one of about 500 feet where claimant was compelled to put in temporary piping in wooden closures, were not built until April, 1930.

Throughout the winter water in large quantities was entering and flowing through the tunnels. It was up to the level of lower pipe lines at times in some tunnel sections where claimant was compelled to go in to continue work to complete the system for use. In places men had to wear rubber boots, and work from scaffolds to keep out of water to avoid shock from the electric welding machine. Great quantities of water

were more or less continuously flowing from the tunnel into the power house where lower levels including the pump pit were flooded. Ice formed and remained on tunnel floors and in the power house. The evidence establishes that the water conditions existing throughout the winter in sections of tunnels, and in the power house, while claimant was being compelled by direct orders to keep to work, were so extreme that it was wholly unreasonable to require claimant to work under such improper site conditions.

During the winter much water was impounded in tunnel sections where claimant had already placed pipe covering. These fabricated coverings, composed of 85% magnesia with asbestos, were very absorbent. The water destroyed large quantities of covering which claimant was compelled to remove and replace at great expense for labor and extra material. Much of the flooding of tunnels and power house during winter and spring was evidently due to storm and drainage waters which could freely enter an open tunnel end at the far northeast corner of the site, *where the construction plans provided for no closure.*

The State represented in its construction drawings that floor drains within the tunnels and power house, which were to be constructed by Kantrowitz, were to terminate and drain into a storm sewer which the State would construct. Although Kantrowitz constructed the floor drains, the State failed and neglected down to the summer of 1930 to provide any storm sewer connections thereto, whereby the drains failed to function and impounded waters accumulated and remained in tunnels and power house.

The court found that on March 15, 1930, the State adopted the temporary expedient of diverting water which had been more or less continuously flowing down through tunnels into the pump pit, by knocking a hole through the tunnel wall outside the power house to pass the water away from the power house. It also found that on August 9, 1930, after tunnels were entirely completed, the State cut a hole through the tunnel wall in profile 5 to discharge from the tunnel water which was entering at the open end provided for by the plans at Station B.

The evidence shows that the extensive and generally continuous flow and accumulation of water within tunnels and power house which greatly increased claimant's labor costs during winter and spring, while claimant was being compelled to continue work, were due to disorderly, discontinuous tunnel building, incompletion of tunnels and open ends and the failure to provide necessary outlet drainage. The water conditions

which caused damages to claimant were not caused or contributed to by any dereliction on its part.

The findings of the Court of Claims that the tunnels were constructed in as continuous a fashion as surrounding conditions permitted, and in accordance with good construction practice, are contrary to the evidence.

The site conditions afforded no substantial reason for not having or adhering to some definite program for orderly tunnel building. The lack of any sequence of construction, or known plan therefor, was bound to be disastrous to the piping contractor. When the original program for continuous tunnel construction through profile 1 was agreed upon at the site in February, 1929, the existence of work roads, the upgrade from Station 5B to Station 8 in profile 1, and the other obstacles now claimed, were all apparent.

The evidence clearly establishes that La Porte, Kantrowitz' excavating subcontractor, was permitted to excavate earth wherever it was easiest to get yardage, without regard to producing any trenches which would allow the concrete subcontractor to build any tunnels either in usual continuity or according to any predetermined plan therefor. While it is a fact that by September a large percentage of total excavation had been removed, and tunnels had been built in many short sections, which finally resulted in substantial lengths being joined together in different profiles, claimant had been compelled to continually shift its forces, equipment and welding machines back and forth from one profile to another from May on, as each short section was completed.

The evidence shows that during August and thereafter the work of building considerable lengths of tunnel still required in several profiles to bring about any continuity in main tunnels was done in a disorderly, halting way.

When Kantrowitz took the contract, it was known that large quantities of rock had to be removed in several locations within lines of the main tunnels. The failure to start excavation of any of this rock until late August, or into September, as shown by the State's reports, and the failure for weeks to remove a great depth of water allowed to accumulate and remain in incompleted trenches accounts for much of the disorderly and disconnected tunnel building. The existence of the temporary work roads were minor obstacles which could have been readily overcome if Kantrowitz had been held to compliance with express provisions relating thereto in his own contract. Irrespective of this, the obstacles which the State's principal witness empha-

sized by no means account for the greater part of the disconnected tunnel building. The work as a whole was not done in any reasonable continuity or according to good practice.

It is evident that failure to seasonably remove rock and properly co-ordinate and excavate trench lines seriously interfered with the tunnel building. Only two small pieces of tunnel were completed during September, and none whatever during October, 1929. Also, considerable interior construction in the power house, which should have been completed in usual practice before claimant should have been required to install some of its light equipment, remained incomplete down to March, 1930.

In making the broad findings that Kantrowitz' work was done according to good practice, the Court of Claims attached much more importance than the record justifies to the testimony of the State's principal witness, who had been Kantrowitz' superintendent from May, 1929, to January 30, 1930. He left the job, and entered the State's employ when work on Kantrowitz' contract was substantially abandoned at about the end of January. Such abandonment continued until March. The State's own construction records show such abandonment and the fact of interference thereby with claimant's work which the State was demanding be carried on in the incompleted structure.

Contrary to the opinions and conclusions expressed by this witness, the State's own construction records in evidence, and the construction photographs show that much of Kantrowitz' work was done in a disorderly manner, and not according to good practice, particularly in respects which would vitally affect and damage a heating contractor who was being compelled to follow up the general construction work.

There are some conflicting findings, but in those most favorable to claimant, the Court of Claims has substantially found that, due to lack of continuity in tunnel building or any known program's being followed by the tunnel builder, usual assembly methods had to be abandoned, that practically all materials had to be brought on the job, stored and rehandled, to avoid delay in compliance with mandatory orders to follow the tunnel builder, that much cutting of pipes and extra welding became necessary to fill in pipes when discontinuous sections were brought together, and that claimant's labor costs in receiving, handling and assembling the heating system in tunnels and piping and light equipment in the power house were thereby greatly increased.

Claimant's increased labor costs in its assembly work were directly caused by being compelled by order and direction to

start and continue its piping installation, and finally tie the system together and complete the same, when tunnels and structures, in which the system was being assembled, were not being constructed, progressed or maintained in such manner that claimant's work therein could be done by usual methods.

Such damages, and also the cost of extra materials to replace the damaged pipe covering, are established by clear and unconflicting evidence. Claimant is entitled to recover the following items of damages: Excess cost of direct labor on piping $63,607.72; extra cost of pipe welding $10,706.85; extra cost of pipe covering labor $36,997.54; and cost of extra pipe covering material damaged by water in tunnels $3,868.09; amounting in all to $115,180.20.

The items claimed for extra cost of superintendence and excess time that equipment was on the job should be disallowed. These last two items may be considered as more in the nature of damages due to delay because the general construction contractor took about twenty-three months to complete the tunnels and power house. Claimant has made satisfactory proof that, with a site of work in proper condition for normal installation, it could have performed its entire contract in eight months' time or by November 1, 1929. However it was at the job from March, 1929, on, and would have had some comparable expense on account of its equipment and superintendent, pending the time when it could have undertaken and proceeded with its assembly work, after tunnels were so progressed that it could have done its work by the usual construction methods.

The judgment appealed from should be reversed on the law and facts and judgment directed for claimant for $115,180.20 with interest from December 24, 1930, together with its costs and disbursements.

HILL, P. J. (dissenting). Appeal from a judgment disallowing claim against the State for damages arising, it is asserted, because of wrongful acts on the part of the State of New York, its agents and employees, in connection with a contract to furnish material and labor for installation of piping for heat and other service purposes in about 11,000 feet of tunneling which connected a power house with 22 buildings constituting the Wassaic State School. Other contractors were to excavate the trenches, prepare the site and build the concrete tunneling to contain the pipes.

The site was an uneven tract of unimproved land and while claimant was engaged in its contract, work was being done by

other contractors upon the buildings and power house. Damages chiefly are asked because the tunnel was not built as a single unit, beginning at one end and progressing connectedly to permit the pipes for steam and water, hot and cold, to be installed with continuity.

The main trunk tunnel started from the power house and ran in an easterly direction about 900 feet. Into this came tributaries from the south and east where the buildings were located; also there were three tunnels which furnished heat and service to the operating buildings which joined it at or near the power house.

The rough and uncultivated terrain was covered with work roads and a railroad siding used by all the contractors. The lack of continuity in the tunnel construction about which claimant raises its chief objection was in connection with the 900-foot trunk earlier mentioned. In connection with this it appears that representatives of the State, the tunnel contractor and claimant, after the contract was let but before work was started, conversed and planned that the excavation should begin about 75 feet easterly from the power house site, then progress in a straight line easterly for substantially 900 feet. Work was begun at the place mentioned, and progressed about 200 feet to a point where there was a sharp rise of ground. At this point there was a road and another at the top of the hill 300 or 400 feet away. It is asserted on behalf of the State and by the construction contractor's employees that the grade was so sharp the ordinary steam shovel could not be used, and it was necessary to do the excavation with a device known as a back hoe, which worked from the top of the hill down. In further explanation of some delay in this area, there was a requirement that the roads for the use of the contractors should be kept open and usable. There is testimony sustaining the finding that five or six weeks' seasoning of the completed concrete tunnel was necessary before the earth surface of a road could be laid on top, and before the earth could be removed for a tunnel where the road had been, an adjacent portion of the tunnel must have aged to support the new location. The proof shows that the westerly 200 feet of the trench on the level was completed about the first of May, 1929, the remainder to the east in two installments a week apart in the latter days of July. The contract by its terms was to be finished November 1st.

In the excavation much rock was encountered. Complaint is made that drillers and employees engaged in rock removal

did not work simultaneously with the earth excavators to effect a continuous construction of the tunnel. An examination of the written records of progress kept by claimant and the other contractors does not indicate unreasonable delay. There is variance between the witnesses produced by the contractors and the State. Some of the oral testimony is uncertain and vague, in part because it was given about eight years after the work was finished. About 8,500 feet of the tunnel had been completed before September, 1929, and the court has found that in August " there were completed portions of tunnel wherein claimant had not installed its work ", and also " that the tunnels were herein constructed in as continuous a fashion as the surrounding conditions permitted and in accordance with good construction practice ", and the evidence sustains these findings.

The claimant cites *American Bridge Co., Inc.,* v. *State of New York* (245 App. Div. 535) as a controlling authority. The claimant there built the superstructure of the Mid-Hudson Bridge at Poughkeepsie. The piers were built by another contractor. The work was delayed for twenty-one months while a pier which had tipped was straightened. The facts there are markedly dissimilar from this case.

BLISS and BREWSTER, JJ., concur; HILL, P. J., dissents in opinion in which SCHENCK, J., concurs.

Judgment appealed from reversed on the law and facts and judgment directed for claimant for $115,180.20, with interest from December 24, 1930, together with costs and disbursements.

The court reverses the following findings of fact contained in the decision: Numbers 38, 41, 42, 44, 45, 48, 49, 50, 51, 52, 53, 54, 55, 56, 59, 62, 63, 64, 70, 73, 75, 76, 77, 79, 80, 81, 82, 83, 84, 85 and 86 and disapproves of conclusions of law Nos. 1, 2 and 3.

The court modifies finding No. 28 contained in the decision by striking out and omitting therefrom the following words: " subject to the exigencies of the construction of the tunnel and so far as it is practical ", and also modifies finding No. 57 of the decision by striking out and omitting therefrom the words: " and through the openings therein left at claimant's request ", and also modifies finding No. 69 of the decision by striking out and omitting therefrom the words: " in so far as it is practical ".

The court reverses the following findings of fact found at the request of the State: Numbers 12, 18, 19, 20, 21, 23, 24, 25, 26, 27, 28, 29, 33, 34, 35, 36, 37, 40, 43, 51, 54, 58, 59, 61, 62, 63, 64, 77, 78, 79, 80, 83, 84, 85, 87, 89 and 90 and disapproves of conclusions of law Nos. I, II, IV, V and VI.

The court makes new findings of fact as set forth in claimant's requests to find numbered 24, 25, 38, 41, 43, 44, 46, 47, 50, 51, 53, 59, 60, 62, 63, 66, 67, 68, 69, 72, 73, 82, 85, 86, 87, 88, 89, 90, 91, 92, 93, 96, 97, 98 and 99.

The court makes the following new finding of fact: That the defendant breached claimant's contract in that, while failing to properly supervise and direct the order and progress of the general construction work on tunnels and the interior of the power house, and to have the same carried on in accordance with proper construction practice, with some definite program for sequence of operations, as would be necessary to properly co-ordinate the precedent general construction work with the subsequent work of assembling the heating system inside the structures, if claimant was to be required to follow up the general construction work, and while failing to have the structures constructed in such manner and so maintained as to afford claimant proper sites of work for concurrently assembling piping therein, defendant wrongfully actively interfered with claimant and its methods of performing its work, by ordering and compelling claimant to begin, and to continue assembling its piping and installing its equipment before the structures were in such stage and condition that usual methods of receiving materials and installing the same could be used, and to closely follow up the discontinuous and disorderly general construction work and to complete its work within incomplete structures, in advance of proper progress of the general construction work.

The court makes the following conclusion of law: Claimant is entitled to an award herein against the State of New York for the sum of $115,180.20, with interest thereon from December 24, 1930.