2014 ND 128

**C & C PLUMBING AND HEATING, LLP, Plaintiff**

v.

**WILLIAMS COUNTY, North Dakota, Defendant, Third–Party Plaintiff, and Appellee**

v.

**American General Contractors, Inc., Third–Party Defendant, Fourth–Party Plaintiff, and Appellant**

v.

**Davis Masonry, Inc., Fourth–Party Defendant, Fifth–Party Plaintiff, and Appellee**

v.

**Parsons Commercial Technology Group, Inc., Fifth–Party Defendant and Appellee.**

No. 20130297.

Supreme Court of North Dakota.

June 24, 2014.

Rehearing Denied July 17, 2014.

Collin P. Dobrovolny, Minot, N.D., for fourth-party defendant, fifth-party plaintiff and appellee Davis Masonry, Inc.

Charles L. Neff, Williston, N.D., for defendant, third-party plaintiff, and appellee Williams County, North Dakota.

Kip M. Kaler, Fargo, N.D., for third-party defendant, fourth-party plaintiff, and appellant.

McEVERS, Justice.

[¶ 1] American General Contractors, Inc. ("AGC"), appeals from a judgment assessing liability and awarding damages and interest for the cost of delays in the construction of the Williams County Law Enforcement Center in Williston. Because AGC has not convinced us that the district court's findings of fact are clearly erroneous or that the court misapplied the law, we affirm.

## I

[¶ 2] In 2006, the Williams County Board of County Commissioners ("County") decided to construct a new law enforcement center and entered into a construction management contract with a firm that was subsequently acquired by Parsons Commercial Technology Group, Inc. ("Parsons"). Parsons solicited bids for 28 prime contracts, and AGC was awarded five prime contracts for a total bid of $3,666,400: (1) building and site concrete; (2) masonry; (3) steel erection; (4) general trades/carpentry; and (5) drywall and plaster. AGC entered into a subcontract with Davis Masonry, Inc. ("Davis"), for the masonry work on the building and with Arnco Diversified, Inc. ("Arnco"), for the steel erection. Each of the County's contracts with the prime contractors contained a "Milestone Schedule" which listed April 2, 2007, as the date for "Start of Construction/Mobilization"; August 15, 2007, as the date for "Building Enclosure and Roofing"; and June 30, 2008, as the date for "Substantial Completion." However, delays with the construction project quickly ensued. Building enclosure and roofing was not achieved until February 15, 2008, and substantial completion was not accomplished until February 19, 2009, about seven and one-half months after the milestone schedule date for substantial completion.

[¶ 3] C & C Plumbing and Heating, LLP ("C & C"), the successful bidder for the mechanical prime contract, brought this action against the County for additional costs incurred as a result of the delay. The County brought a third-party complaint against AGC, which in turn counterclaimed against the County and brought a fourth-party action against its subcontractor, Davis. Davis counterclaimed against AGC and brought a fifth-party action against Parsons. The district court dismissed the fifth-party action against Parsons on summary judgment and held a bench trial on the remaining claims between the parties.

[¶ 4] In a 94–page opinion, the district court found that the first four months of the delay was attributable to causes "inherent in the construction industry." The court found the remaining three and one-half months of delay was "largely attributable" to the County, through its agent Parsons, for "active interference" with its contractors. The court concluded it was appropriate for the County and AGC to share responsibility for providing temporary shelter and heat on the project. The court apportioned 47 percent of the liability for the costs of the delay for the three and one-half months of active interference to the County and 53 percent to AGC, for the four months delay inherent to the industry. The court awarded C & C approximately $73,000 on its claim against the County. After offsetting amounts owed between the parties, the court awarded AGC approximately $424,000 on its claim against the County. The court awarded Davis approximately $96,000 from AGC for masonry work completed under its subcontract with AGC, and rejected AGC's claimed offsets to that amount. Davis had provided heat, cover and shelter for the project during cold weather and sought $649,000 from the County and AGC for that expense including prompt payment interest. Davis had settled with the County for $530,000, and the court ruled AGC was responsible for 53 percent of the remaining $119,000, or $63,070.

## II

[¶ 5] AGC argues the district court made several errors of law and fact in its decision.

[¶ 6] Our standard of review of a bench trial is well-established:

In an appeal from a bench trial, the trial court's findings of fact are reviewed under the clearly erroneous standard of N.D.R.Civ.P. 52(a) and its conclusions of law are fully reviewable. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, after reviewing all the evidence, we are left with a definite and firm conviction a mistake has been made. In a bench trial, the trial court is the determiner of credibility issues and we do not second-guess the trial court on its credibility determinations.

*Trosen v. Trosen,* 2014 ND 7, ¶ 20, 841 N.W.2d 687 (quoting *Niles v. Eldridge,* 2013 ND 52, ¶ 6, 828 N.W.2d 521).

### A

■ [¶ 7] AGC argues the district court erred in determining AGC was liable for any of the costs incurred from the delay under its contract with the County.

[¶ 8] Each of the "AIA" contracts between the County and the contractors, including AGC, provided in relevant part:

§ 6.2.3 Costs caused by delays or by improperly timed activities or defective construction shall be borne by the party responsible therefor.

. . . .

§ 8.2.1 Time limits stated in the Contract Documents are of the essence of the Contract. By executing the Agreement the Contractor confirms that the Contract Time is a reasonable period for performing the Work.

. . . .

§ 8.3.1 If the Contractor is delayed at any time in progress of the Work by an act or neglect of the Owner's own forces, Construction Manager, Architect, any of the other Contractors or an employee of any of them, or by changes ordered in the Work, or by labor disputes, fire, unusual delay in deliveries, unavoidable casualties or other causes beyond the Contractor's control, or by delay authorized by the Owner pending arbitration, or by other causes which the Architect, based on the recommendation of the Construction Manager, determines may justify delay, then the Contract Time shall be extended by Change Order for such reasonable time as the Architect may determine.

. . . .

17.2.1  It is the Owner's intent to complete the Project as soon as possible, and in this pursuit the Owner may coordinate the scheduling function. The Contractor agrees to cooperate in scheduling and performing the Work to achieve completion of the Project as soon as possible.

17.2.2  *The Contractor acknowledges and accepts the prospects of such delays, interferences and interruptions to the progress of the Project and to the Work as are inherent in the construction industry. The Contractor represents that they have included compensation for such delays, interferences and interruptions in the Contract Sum.*

17.2.3  The Owner does not guarantee that delays, interferences and/or interruptions to the Work will not occur. The Owner expressly disclaims any responsibilities or obligations resulting from delays, interferences or interruptions.

17.2.4  The Contractor shall not be entitled to additional compensation or damages due to delays, interferences or interruptions to the Work or the Project, but shall

be entitled only to an appropriate extension of time in accord with the General Conditions of the Contract for Construction.

. . . .

18.1.2 The Work to be performed under this Contract shall be commenced immediately and be completed in accordance with the milestone schedule and the subsequent construction schedule incorporating scheduling input from the Contractors on the Project. Contractor agrees to complete its Work in accordance with the construction schedule as updated from time to time, and specifically in accordance with day-to-day schedule input submitted to the Construction Manager by the Contractor and accepted by the Construction Manager for incorporation in the construction schedule. It is expressly understood and agreed that upon request by the Construction Manager the Contractor shall adjust its individual scheduled activities to allow coordination of the Project Work, to achieve established milestone dates or to allow completion of the Project in an expeditious manner, all without additional compensation to the Contractor or damages of any kind.

18.1.3 The Construction Manager will provide a Milestone Schedule which will establish the major points of completion during construction, and toward which Contractors shall orient their efforts.

(Emphasis added).

[¶ 9] AGC argues the "no damages for delay" clause creates an ambiguity in the contract when considered in conjunction with the milestone schedule and the clause requiring costs caused by delays to be "borne by the party responsible." AGC contends the County should be held entirely responsible for costs incurred by the delay because it breached the contract by failing to meet its milestone date for building enclosure.

[¶ 10] The district court concluded this Court's decision in *Markwed Excavating, Inc. v. City of Mandan*, 2010 ND 220, 791 N.W.2d 22, was controlling. In *Markwed*, we held that a no damages for delay clause, similar to section 17.2.4 of the contract here, unambiguously insulated the city from liability to a contractor for uncontemplated delays in the performance of the contractor's work, even though the construction contract also included a time is of the essence clause. *Id.* at ¶¶ 19–20. This Court reasoned:

[O]ur statutes reflect a preference for construing contracts with public entities in favor of the public entity. *See* N.D.C.C. § 9-07-19. The inclusion of the no damages for delay clause in the contract reflects that some delays could not be contemplated when the parties contracted and that the clause resolves disputes conclusively "for causes resulting in delays or hindrances to the work." Although the contract includes a provision stating that time is of the essence, that provision does not override the specific provision precluding compensation "for causes resulting in delays or hindrances to the work." Allowing extensions of time is not repugnant to a provision stating time is of the essence because extensions would be unnecessary without a provision stating time is of the essence. Moreover, the language for extensions of time for "unavoidable delays ... resulting from causes such as

Acts of Providence, fortuitous events and the like" does not create an ambiguity because that language applies to reasons for extensions of time and not to causes for delay.

When the provisions of this contract are considered together, as they must be under North Dakota contract law, the plain and unambiguous language of the contract does not include an exception for uncontemplated delays and includes delays allegedly caused by an act or neglect by Mandan or Swenson [project manager]. We conclude the no damages for delay clause is not repugnant to other provisions of the contract and, when harmonized with other provisions of the contract as required by North Dakota law, is not ambiguous and does not include an exception for uncontemplated delays.

*Id.*

[¶ 11] AGC argues *Markwed* is distinguishable because it is unclear from the opinion whether the contract in that case included a milestone schedule of dates or a clause similar to section 6.2.3 stating costs caused by delays "shall be borne by the party responsible." However, similar to the milestone schedule here, the contract in *Markwed* required Markwed to complete its work on the project by May 1, 2007. *Markwed*, 2010 ND 220, ¶ 4, 791 N.W.2d 22. The clause stating costs caused by delay "shall be borne by the party responsible" would render the no damages for delay clause "meaningless" and violate "the preference for construing contracts with public entities in favor of the public entity." *Id.* at ¶ 19. AGC contends that giving effect to the no damages for delay clause renders the construction contract unconscionable. The district court made no findings whether the contracts between the County and AGC were unconscionable, and from our review of the record, we have found nothing in AGC's pleadings or trial court briefs specifically raising this issue. If a party fails to plead and adequately brief unconscionability to the district court, we will not consider the issue on appeal. *See Darby v. Swenson Inc.*, 2009 ND 103, ¶ 22, 767 N.W.2d 147.

[¶ 12] In any event, the contracts in section 17.2.2 specifically provided that AGC "acknowledges and accepts the prospects of such delays, interferences and interruptions to the progress of the Project and to the Work as are inherent in the construction industry" and that AGC has "included compensation for such delays, interferences and interruptions in the Contract Sum." The district court found the project's "slow start" was attributable to delay-producing acts and occurrences "inherent in the construction industry," and this four-month period from April through July 2007 was "lost time that was never made up." The court found there were three factors that contributed to the initial four month delay: "1. Adverse weather conditions at the job site pushed back the start date for site excavation from April 2, 2007, to April 25, 2007. 2. After the June, 2007, discovery of a large boulder in the proposed jack hole for Elevator No. 1, special crews were brought in from the Minnesota Iron Range to remove the same. 3. Pace Construction [the excavation contractor] failed to complete its site excavation/back fill work in a timely manner...." The court's finding on this issue is amply supported by the evidence. AGC has not alleged, and the court did not find, that AGC ever specifically requested an extension of time under the no damages for delay provision of section 17.2.4. AGC's claim that requiring masonry work in winter conditions is a "cardinal change" to the contract is without merit. Under the circumstances, this cannot be considered "an alteration in the work so drastic

that it effectively requires the contractor to perform duties materially different from those originally bargained for." 64 Am. Jur.2d *Public Works and Contracts* § 179 (2011) (footnote omitted).

[¶ 13] We conclude the district court did not err in giving effect to the no damages for delay clause during the first four months of delays when AGC specifically contracted and included compensation in its contract for the same.

### B

■ [¶ 14] The district court found the County liable for the costs caused by the delay during the last three and one-half months of the delay notwithstanding the no damages for delay clause which "exculpates an owner from liability for damages resulting from delays in the performance of the contractor's work." *Markwed*, 2010 ND 220, ¶ 12, 791 N.W.2d 22. The court found the County, through its agent, Parsons, "active[ly] interfere[d]" with its contractors during this latter time frame.

■ [¶ 15] "Active interference" is a well-recognized exception to the enforceability of a no damages for delay clause. *See, e.g.,* M. Brunner, Annot., *Validity and construction of "no damage" clause with respect to delay in building or construction contract,* 74 A.L.R.3d 187, § 7[e] (1976); 13 Am.Jur.2d *Building and Construction Contracts* § 60 (2009); S. Lesser and D. Wallach, *Risky Business: The "Active Interference" Exception to No–Damage–for–Delay Clauses,* 23 Construction Law. 26 (Winter 2003). "The active interference exception arises from the notion that in a contract . . .—wherein time is of the essence, yet the contractee's liability for delay is limited through a no damage clause—there is an implied obligation on the part of the contractee to refrain from anything that would unreasonably interfere with the contractor's opportunity to proceed with its work in the manner provided by the contract and to permit the contractor to carry on that work with reasonable economy and dispatch." *United States Steel Corp. v. Missouri Pac. R.R. Co.,* 668 F.2d 435, 438 (8th Cir.1982). In *Tricon Kent Co. v. Lafarge N. Am., Inc.,* 186 P.3d 155, 161 (Colo.Ct.App.2008), the court explained:

> [A] plaintiff contractor or subcontractor claiming active interference on the part of the defendant owner or contractee needs only to show that the defendant committed an affirmative, willful act that unreasonably interfered with the plaintiff's performance of the contract, regardless whether it was undertaken in bad faith. However, we further conclude that, while it is unnecessary to show bad faith or reprehensible conduct, active interference requires more than a simple mistake, error in judgment, lack of total effort, or lack of complete diligence.

[¶ 16] Arnco was a subcontractor to AGC for steel erection on the project. The district court found that Parsons directed Arnco "to put up steel wherever it could . . . to demonstrate to [the County] that progress was being made." According to the court, Parsons rejected Arnco's plan to erect the steel in a conventional "inside-out" fashion and demanded that Arnco erect the steel in an "outside-in" manner which resulted in further delay. The court found Parsons' directive "effectively usurp[ed] Arnco's exclusive authority to perform its steel erection work in accordance with its own means and methods" and constituted active interference. The County did not file a cross-appeal to challenge the court's finding of active interference.

[¶ 17] AGC argues the district court should not have assessed 53 percent of the responsibility for the costs of the delay

against AGC because "the court found no delay caused by AGC." AGC misinterprets the court's opinion and ignores the evidence.

[¶ 18] In its masonry prime contract with the County, AGC agreed to construct and maintain temporary protection during cold weather to permit work to progress. In its masonry subcontract with AGC, Davis specifically excluded responsibility for heating, covering and sheltering during cold weather. AGC admits that it "contractually agreed to pay for heat and shelter as necessary to protect its work." On November 2, 2007, Davis reported the need for heating, covering, and sheltering to AGC, but AGC informed Davis that it would not cover the winter heating, covering and sheltering. Davis then informed Parsons about the need for winter shelter and that it would not work in cold weather conditions without assurances of being paid for the costs of heating, covering and sheltering. AGC continued to maintain that winterization costs were uncontemplated costs at the time AGC bid the masonry prime contract, and because the contract was delayed beyond the August 15, 2007 building enclosure date, AGC would not assume responsibility unless the County paid it additional money. Parsons and the County then entered into a Field Change Authorization ("FCA # 30") directly with Davis to cover the costs of heating and sheltering the masonry work and materials, and indicated those costs would be billed back to AGC. Davis presented a bill for FCA # 30 to the County, which the County refused to pay. Davis sought $649,000 for heat, cover and shelter, which included prompt payment interest. The County eventually settled with Davis for $530,000, with the proviso that the County and Davis would present the remaining claim for $119,000 against AGC to the court.

[¶ 19] During the trial, the County argued AGC caused the clear majority of man-made delays on the project. The County primarily relied on what the district court termed the alleged "dimension problem." The County asserted AGC failed to properly measure and lay out its work before proceeding and to report problems or discrepancies to the County before starting the work, and AGC's inattention to details resulted in improper placement of pad footings and walls. The County also alleged numerous "second tier" and "third tier" concerns about AGC's performance that the County estimated caused approximately two months of the delay. These concerns, described in detail in the court's opinion, included AGC's failure to provide sufficient manpower to perform the taping of sheetrock, ultimately requiring the County to hire a different company to finish the job. The County alleged AGC failed to honor its commitment to have the building ready to accommodate installation of precast concrete exterior wall panels, resulting in two work stoppages where the transport trucks had to be turned back and unloaded. The County also alleged welding by AGC had to be redone because it was not performed by a certified welder and several large cracks appeared in a central load bearing wall which required evacuation of the structure and repair because AGC had improperly grouted. Numerous other deficiencies on the part of AGC were alleged by the County.

[¶ 20] The district court rejected the County's primary argument about the "dimension problem," finding "by the greater weight of the evidence, that if Arnco had been allowed to erect the steel in accordance with its preferred method (i.e., "inside-out"), the 'dimension problem' could have been taken care of with a minimal expenditure of time and effort on the part of Arnco." However, the court did not

reject the "second tier" and "third tier" concerns outlined by the County. The Court reasoned:

> While AGC maintains *no* backcharges for temporary shelter and heat can properly be made against any of its contracts in this case, as the result of the failure to obtain building enclosure by the milestone date of August 15, 2007, the Court observes that, unlike Davis, AGC did *not* exclude the provision of temporary shelter and heat from any of its contracts with the County. Accordingly, and recognizing the total amount of delay on this project was approximately seven and one-half (7 ½) months, of which approximately four (4) months was delay "inherent in the construction industry" and the other approximately three and one-half (3 ½) months largely attributable to Parsons' usurpation of Arnco's exclusive authority to control the means and methods of steel erection on this project, the Court deems it appropriate to require the County and AGC to *share* the responsibility for providing temporary shelter and heat on this project—with AGC being required to pick up fifty-three percent (53%) of the "tab" (for temporary shelter and heat), and the County forty-seven percent (47%) (i.e., four [4] months ÷ seven and one half [7 ½] months = .53; three and one-half [3 ½] months ÷ seven and one-half [7 ½] months = .47).

[¶ 21] AGC argues the district court improperly relied on its failure to exclude the provision of heat and shelter from its contracts with the County because it had no "choice to exclude heat and shelter" from its bids. According to AGC, had it done so its bids would have been disqualified as "nonresponsive." This argument is without merit because if AGC did not want any responsibility for shelter and heat costs, it should not have submitted any bids on the project.

■ [¶ 22] Proximate causation is a question of fact. *See Romsos v. Sorben,* 474 N.W.2d 83, 84 (N.D.1991). We cannot say the district court's assessment of liability between the County and AGC for the shelter and heat costs incurred by the delay is clearly erroneous.

C

■ [¶ 23] AGC argues the district court erred in holding it liable to the County for the prompt payment interest portion of the $530,000 settlement and in holding it liable to Davis for prompt payment interest.

■ [¶ 24] The prompt payment provisions of N.D.C.C. ch. 13–01.1 require prompt payment by state agencies, political subdivisions and school districts for property and services and requires interest on overdue payments. *See Olander Contracting Co. v. Gail Wachter Invs.,* 2003 ND 100, ¶ 3, 663 N.W.2d 204; *Olander Contracting Co. v. Gail Wachter Invs.,* 2002 ND 65, ¶ 41, 643 N.W.2d 29. The problem with AGC's argument is that the district court did not order AGC to pay any prompt payment interest. Rather, the court ordered AGC to share in satisfying the damages that flowed from its breach of contract.

■ [¶ 25] Under N.D.C.C. § 32–03–09, the measure of damages for breach of contract "is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby." A district court's determination of the amount of damages caused by a breach of contract is a finding of fact subject to the clearly erroneous standard of review. *Cavendish Farms, Inc. v. Mathiason Farms, Inc.,* 2010 ND 236, ¶ 20, 792 N.W.2d 500. Prompt payment interest was a detriment at least partially caused by AGC's failure

to honor its contractual commitment to provide heat and shelter. AGC claims the County failed to mitigate the damages because it did not timely pay the amount due under its contract with Davis. This argument is disingenuous because had AGC complied with its undisputed contractual responsibility to provide heat and shelter, prompt payment interest issues would not have arisen. AGC is in no position to complain about mitigation of damages when AGC refused to do anything when winter arrived, requiring the County to contract with Davis so work on the project could proceed.

[¶ 26] We conclude the district court's findings on damages are not clearly erroneous.

### III

[¶ 27] We do not address other arguments raised because they either are unnecessary to the decision or are without merit. The judgment is affirmed.

[¶ 28] GERALD W. VANDE WALLE, C.J., DANIEL J. CROTHERS, DALE V. SANDSTROM, and CAROL RONNING KAPSNER, JJ., concur.